IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HESS CORPORATION, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-16-3415 |
| | § | |
| SCHLUMBERGER TECHNOLOGY | § | |
| CORPORATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

I.    Motions to Exclude . . . . . . . . . . . . . . . . . . . 4

II.   Undisputed Facts and Procedural Background . . . . . . . . 7

III.  Standard of Review . . . . . . . . . . . . . . . . . . . 15

IV.   Applicable Law . . . . . . . . . . . . . . . . . . . . . 17

V.    Schlumberger's Motion for Summary Judgment . . . . . . . 21

      A.   Schlumberger is Not Entitled to Summary Judgment on
           Hess's Breach of Contract Claims as to the Four Valves
           . . . . . . . . . . . . . . . . . . . . . . . . . . 22

           1.   Hess Did Not Expressly Disclaim the Right to
                Challenge the Alleged Non-Conformities After a Year
                . . . . . . . . . . . . . . . . . . . . . . . . 22

                (a)  The Court's Prior Ruling Does Not Foreclose
                     Any Aspect of Schlumberger's MSJ . . . . 23

                (b)  Whether Hess's Revocation Claims Are Time-
                     Barred is a Fact Issue for Trial . . . . 24

2. Schlumberger Is Entitled to Partial Summary Judgment Based on the MSC's Indemnity and Release Provisions . . . . . . . . . . . . . 33

    (a) Replacement Valve Cost Is Not "Damage To or Loss of" Hess's Property . . . . . . . . 36

    (b) Costs to Retrieve and Replace the SSVs Is Not "Damage To or Loss of" Hess's Property . 38

    (c) Lost Profits Are Not "Damage to or Loss of" Hess's Property . . . . . . . . . . . . . 43

    (d) Methanol Contamination is "Damage to or Loss of" Hess's Property . . . . . . . . . . . 44

3. Whether Schlumberger Breached the Contract Presents Fact Issues for Trial . . . . . . . . . . . . 46

    (a) Whether Schlumberger Breached API 14A § 6.3.2.2 is a Fact Issue for Trial . . . 47

    (b) Whether Schlumberger Breached API 14A § 7.6.2 is a Fact Issue for Trial . . . . . . . . 50

    (c) Whether Schlumberger Breached API 14A § 7.6.3(c) is a Fact Issue for Trial . . 54

    (d) Hess Has Alleged Violations of the Eleventh Edition of API 14 . . . . . . . . . . . . 56

B. Schlumberger is Not Entitled to Summary Judgment on Hess's Breach of Contract Claim for the Well B(2) Valve . . . . . . . . . . . . . . . . . . . . . . 58

    1. Well B(2) Claim is a "Disputed Claim" under Clause (a) of the Bridging Agreement . . . . . . . . 59

    2. Well B(2) Claim is Not a "Disputed Claim" Pursuant to Clause (b) of the Bridging Agreement . . . 61

C.   Schlumberger is Not Entitled to Summary Judgment because Hess has Failed to Satisfy the Appropriate Standard to Recover Incidental Damages . . . . . . . . . . . . 62

VI.  Hess's Motion for Partial Summary Judgment . . . . . . . 67

A.   The MSC's Indemnity-and-Release Provisions Encompass Hess's Breach of Contract Claims . . . . . . . . . 70

B.   Hess Is Entitled to Partial Summary Judgment on Schlumberger's Affirmative Defense of Release and Counterclaim for Indemnity . . . . . . . . . . . 77

VII. Conclusions and Order . . . . . . . . . . . . . . . 78

Pending before the court are Defendant Schlumberger Technology Corporation's Motion for Summary Judgment ("STC's MSJ") (Docket Entry No. 116), and Hess Corporation's Motion for Partial Summary Judgment on Schlumberger's Affirmative Defense of Release and Counterclaim for Indemnity ("Hess's MPSJ") (Docket Entry Nos. 117 (redacted) and 118 (unredacted)). For the reasons stated below, STC's MSJ will be granted in part and denied in part, and Hess's MPSJ will be granted in part and denied in part. Also pending are Hess Corporation's Motion to Exclude Expert Report of Lawyer Cary A. Moomjian (Docket Entry Nos. 119 (redacted) and 120 (unredacted)) and a number of motions seeking to exclude the testimony of expert witnesses: Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Dennis Read (Docket Entry No. 121); Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of David Hirth (Docket Entry No. 122); Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Peter Koopmans (Docket Entry No. 123); Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Barry Pulliam (Docket Entry No. 124); and Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Rolle Hogan (Docket Entry No. 125).

## I. **Motions to Exclude**

Hess moves to exclude the Moomjian Report arguing that his "legal opinions interpreting the . . . indemnity-and-release

-4-

provisions should be excluded because they are irrelevant and do not provide meaning to any specialized or scientific terms of art."[1] On the first page of his report Lawyer Cary A. Moomjian states: "I have been retained in relation to the Litigation for the sole purpose of providing my expert opinion on the applicability of the releases and indemnities between [Schlumberger] and Hess under the relevant contracts. I will limit this Report & Opinion to that issue and related matters."[2] Because the parties do not contend that the contract language at issue is ambiguous, the applicability of the contract's release and indemnity provisions present questions of law for the court to decide. See Coker v. Coker, 650 S.W.2d 391, 393 (Tex. 1983) ("If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law.").

Under Rule 702 an expert must possess "specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a). The Fifth

---

[1]Hess Corporation's Motion to Exclude Expert Report of Lawyer Cary A. Moomjian ("Hess's Motion to Exclude Moomjian Report"), Docket Entry Nos. 119 (redacted) and 120 (unredacted), pp. 3-4.

[2]Report and Opinion of C. A. Moomjian, Jr., President, CAM OilServ Advisors LLC ("Moomjian Report"), p. 1:32-35, Exhibit 1 to Hess's Motion to Exclude Moomjian Report, Docket Entry No. 120-2, p. 2:32-35.

Circuit has consistently held that legal opinions are not a proper subject of expert testimony because they do not assist the trier of fact in understanding the evidence, but instead merely tell the trier of fact what result to reach. See Estate of Sowell v. United States, 198 F.3d 169, 171-72 (5th Cir. 1999) (forbidding expert testimony as to whether a fiduciary was "acting reasonably"); Askanase v. Fatjo, 130 F.3d 657, 672-73 (5th Cir. 1997) (holding that the trial court properly excluded expert legal opinions as to whether defendants breached various fiduciary duties); Salas v. Carpenter, 980 F.2d 299, 305 (5th Cir. 1992) (noting that expert testimony must bring to the trier of facts more than the lawyers can offer in argument). Because the applicability of the releases and indemnities in the parties' contract presents questions of law for the court to decide, because the Moomjian Report offers only legal opinions, and because the legal questions at issue have been fully briefed by the parties, Hess's Motion to Exclude the Moomjian Report will be granted.

Schlumberger moves to exclude the expert testimony of Rolle Hogan arguing that he is neither qualified nor able to opine on provisions of the parties' contract.[3] Hess responds that it "does not intend to offer Mr. Hogan to tell the Court how to interpret the unambiguous [contract]. That is for the Court to decide, which

---

[3]Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Rolle Hogan, pp. 5-11, Docket Entry No. 125, pp. 10-16.

is the precise reason why Hess has moved to exclude the inadmissible legal opinions of Schlumberger's lawyer expert."[4] Hess also states: "If the Court grants Hess's motion, then Schlumberger's becomes moot; Hess will de-designate Mr. Hogan as an expert witness, and call him instead only as a fact witness."[5] Because the court has decided to grant Hess's Motion to Exclude the Moomjian Report, Schlumberger's Motion to Exclude the Expert Testimony of Rolle Hogan will be denied as moot.

The court's usual practice is to rule on motions to exclude expert testimony during the course of trial because experts frequently modify their opinions, and at trial counsel often establish more extensive predicates for experts' testimony. Moreover, the context in which an expert's opinion is offered is necessary to effectively rule on such issues. Accordingly, the remaining motions to exclude expert testimony, which deal with disputed fact issues concerning liability, causation, and damages, will all be denied without prejudice to being reurged during trial.

## II. <u>Undisputed Facts and Procedural Background</u>

This is a breach of contract action arising from the failure of four Subsurface Safety Valves ("SSVs") that Hess purchased from Schlumberger for Wells B, C, and D in the Tubular Bells Field of

---

[4]Hess Corporation's Response in Opposition to Schlumberger Technology Corporation's Motion to Exclude Expert Testimony of Rolle Hogan, Docket Entry No. 134, p. 1.

[5]<u>Id.</u> at n.1.

the Mississippi Canyon on the Outer Continental Shelf of the Gulf of Mexico approximately 135 miles southeast of New Orleans, Louisiana.[6] Hess is the operator of the Tubular Bells Field, and Chevron is the non-operating working interest owner. The subsea wells are connected to the Gulfstar One production facility.[7]

The contract consists of multiple agreements and project documents, including: Commercial Agreement Number 46000010410 ("Commercial Agreement") effective April 18, 2012;[8] Hess project document titled "GoM Tubular Bells & Llano 4 SCSSV Requirements Rev. 5" incorporated into the Commercial Agreement at Exhibit A - Scope of Work;[9] Schlumberger Quality Control Plan dated March 22, 2012, incorporated into the Commercial Agreement at Exhibit J;[10]

---

[6]The following facts are derived from the factual allegations included in Plaintiff's Third Amended Complaint ("TAC"), Docket Entry No. 71, pp. 11-29, and from the factual statements included in STC's MSJ, pp. 5-11, Docket Entry No. 116, pp. 11-17, and Hess's MPSJ, pp. 2-7, Docket Entry No. 118, pp. 9-14. Page numbers for docket entries in the record refer to the pagination inserted at the top of the page by the court's electronic filing system.

[7]Id.

[8]Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1. See also TAC, Docket Entry No. 71, p. 11 & n.1 (stating that citations to exhibits are to exhibits attached to Hess's Second Amended Complaint).

[9]Exhibit 1 - Tab 2 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-2. See also Exhibit A to the Commercial Agreement, Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1, p. 13 ("The document titled GoM Tubular Bells & Llano 4 SCSSV Requirements Rev. 5 (seventeen [17] pages) is attached hereto and made a part hereof.").

[10]Exhibit 1 - Tab 4 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-4. See also Exhibit J to the Commercial
(continued...)

-8-

American Petroleum Institute Specification 14A ("API 14A") incorporated into the Commercial Agreement at Exhibit J;[11] the Master Service Contract 7525 ("MSC") entered into by the parties in February of 2000 incorporated into the Commercial Agreement at ¶ 2;[12] Hess Drawings and Specifications incorporated into the Commercial Agreement at Exhibit K, p. 78;[13] and project Purchase Orders and Field Tickets incorporated into the Commercial Agreement at ¶ 2(a) of the MSC.[14]

---

[10](...continued)
Agreement, Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1, p. 76 ¶ 2.4 ("Quality Assurance").

[11]Exhibit 1 - Tab 5 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-5. See also Exhibit J to the Commercial Agreement, Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1, pp. 76-77 ¶ 2.10.

[12]Exhibit 1 - Tab 3 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-3. See also Commercial Agreement, p. 1 ¶ 2, Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1, p. 5 ("The Parties and their Affiliates entered into Master Service [Contract] No. 7525 dated effective as of February 6, 2000 (the 'MS[C]'). The Parties agree that this Agreement is made subject to and in accordance with all the terms and conditions of the MS[C] (as such MS[C] may have been and may be amended), and that the terms and conditions of the MS[C] are hereby incorporated by reference and made part of the Agreement. . . .").

[13]Exhibit 1 - Tab 6 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-6. See also Exhibit K — Drawings and Specifications to the Commercial Agreement, p. 78, Exhibit 1 - Tab 1 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-1, p. 82.

[14]Exhibit 1 - Tab 7 (Purchase Orders) and Tab 8 (Field Tickets) to Plaintiff's Second Amended Complaint, Docket Entry Nos. 25-7 and 25-8. See also MSC, p. 1 ¶ 2(a), Exhibit 1 - Tab 3 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-3, p. 3 ¶ 2(a).

The SSVs were installed in April of 2014 in Well D, June of 2014 and February of 2016 in Well B, and April of 2015 in Well C.[15] Production on Well B began on December 14, 2014, and ceased on January 29, 2016, due to valve failure.[16] A Schlumberger replacement valve installed in Well B allowed production to resume on June 13, 2016, but in March of 2018 production ceased again due to the replacement valve's failure.[17] Production on Well D began on January 14, 2015, and ceased on August 10, 2015, due to valve failure.[18] Production on Well C began on July 21, 2015, and ceased due to valve failure on July 28, 2016.[19]

Hess reported each valve failure to Schlumberger. Schlumberger investigated the failures and concluded that they were primarily caused by the quality of the Metal Spring Energized ("MSE") seals. On April 29, 2016, Schlumberger issued a report stating that it had identified an issue with the seals and had engaged in a recall of all SSVs manufactured from 2012 to 2015.[20]

---

[15]TAC, Docket Entry No. 71, p. 15 ¶¶ 41-43.

[16]Id. at 16 ¶ 45.

[17]Id. at 17 ¶¶ 53-54.

[18]Id. 15-16 ¶ 44.

[19]Id. at 16, ¶ 46. See also Expert Report of Barry Pulliam ("Pulliam Report"), ¶¶ 15-17, Exhibit 7 to STC's MSJ, Docket Entry No. 116-7, ¶¶ 15-17.

[20]Schlumberger Field Return Analysis Report Rev. 7, dated April 29, 2016, pp. 28-29 of 55, Exhibit 3 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-10, pp. 29-30.

On May 17, 2016, Hess notified Schlumberger that it revoked acceptance of the SSVs used in Wells D and B pursuant to § 2.608 of the Texas Business & Commerce Code.[21] On July 29, 2016, Hess notified Schlumberger that it revoked acceptance of the SSV used in Well C on the same basis.[22]

On November 18, 2016, Hess filed this action alleging breach of contract under Texas Business and Commerce Code § 2.608 seeking "the cost of cover for each valve, incidental damages, consequential damages, attorney's fees and expenses, costs of suit, pre- and post-judgment interest at the maximum legal rate, and all such other and further relief, equitable and legal, to which Hess justly is entitled."[23] After Hess filed this action, the parties entered a Bridging Agreement that excepts "Disputed Claims," but otherwise amends the MSC "for contracts between the Parties entered into before, on or after" the effective date of January 1, 2017.[24]

---

[21]TAC, Docket Entry No. 71, p. 27 ¶ 81. <u>See also</u> Hess's MPSJ, p. 5, Docket Entry No. 118, p. 12, and Notice of Revocation Under Section 2.608 of Tex. Bus. & Com. Code, dated May 17, 2016, Exhibit 16 to Hess's MPSJ, Docket Entry No. 118-17.

[22]TAC, Docket Entry No. 71, p. 27 ¶ 82. <u>See also</u> Hess's MPSJ, p. 5, Docket Entry No. 118, p. 12, and Notice of Revocation Under Section 2.608 of Tex. Bus. & Com. Code, dated July 29, 2016, Exhibit 17 to Hess's MPSJ, Docket Entry No. 118-18. Hess revoked acceptance of the replacement valve used in Well B on March 23, 2018, on the same basis. <u>See</u> TAC, Docket Entry No. 71, p. 27 ¶ 84. <u>See also</u> Hess's MPSJ, p. 5, Docket Entry No. 118, p. 12, and Notice of Revocation Under Section 2.608 of Tex. Bus. & Com. Code, dated March 23, 2018, Exhibit 18 to Hess's MPSJ, Docket Entry No. 118-19.

[23]<u>See</u> Plaintiff's Original Complaint, Docket Entry No. 1, p. 10.

[24]Bridging Agreement, Exhibit 4 to STC's MSJ, Docket Entry No. 116-4, p. 2 ¶ 1.a.

On December 8, 2016, Schlumberger moved to dismiss Hess's Original Complaint because the SSVs complied with the contract's time-limited warranties.[25] On January 27, 2017, the court entered a Memorandum Opinion and Order directing Hess to file an amended complaint identifying specific contractual obligations the SSVs failed to meet.[26]

On February 15, 2017, Hess filed Plaintiff's First Amended Complaint,[27] and on March 1, 2017, Schlumberger filed Defendant's Motion to Dismiss First Amended Complaint under Rule 12(b)(6).[28] At the initial pretrial and scheduling conference held on March 3, 2017, the court ordered Hess to amend its complaint again, ordered Schlumberger to file an amended motion to dismiss, and directed the parties to identify legal criteria for distinguishing claims for breach of contract from claims for breach of warranty.[29]

On March 17, 2017, Hess filed Plaintiff's Second Amended Complaint asserting claims for breach of contract under Texas common law and Texas Business and Commerce Code § 2.608.[30] Hess

_____

[25]Defendant's Motion to Dismiss Under Rule 12(b)(6), Docket Entry No. 8.

[26]Memorandum Opinion and Order, Docket Entry No. 13.

[27]Plaintiff's First Amended Complaint, Docket Entry No. 15, pp. 17-19 ¶¶ 63-73 (breach of contract pursuant to Texas Business and Commerce Code ¶ 2.608), and ¶¶ 74-77 (breach of contract).

[28]Docket Entry No. 18.

[29]Transcript of Hearing on Scheduling Conference Before the Honorable Sim Lake, Docket Entry No. 22.

[30]Plaintiff's Second Amended Complaint, Docket Entry No. 25, pp. 28-30 ¶¶ 87-98 (breach of contract pursuant to Texas Business
(continued...)

alleged that the SSVs containing the defective MSE seals were non-conforming goods and that the non-conformities substantially impaired the value of the SSVs to Hess. Hess reasserted the prayer for relief from its Original Complaint seeking the cost of cover, incidental damages, consequential damages, attorney's fees and expenses, costs of suit, pre- and post-judgment interest, and all other relief, equitable and legal, to which Hess is justly entitled.[31]

Citing disclaimers contained in the parties' contract, and arguing that each of the installed SSVs functioned for a period of at least one year, Schlumberger moved to dismiss Plaintiff's Second Amended Complaint pursuant to Rule 12(b)(6).[32] On June 29, 2017, the court entered a Memorandum Opinion and Order granting in part and denying in part Schlumberger's motion to dismiss upon concluding that the two breach of contract claims asserted in Hess's Second Amended Complaint were indistinguishable and that Chapter 2 of the Texas Business and Commerce Code provides the applicable law.[33] The court also concluded that Hess had alleged enough facts to support a viable revocation claim because

---

[30](...continued)
and Commerce Code ¶ 2.608), and pp. 30-31 ¶¶ 99-103 (breach of contract).

[31]Id. at 31 (Prayer for Relief).

[32]Defendant's Motion to Dismiss Second Amended Complaint Under Rule 12(b)(6), Docket Entry No. 29.

[33]Memorandum Opinion and Order, Docket Entry No. 40, p. 6 n.20. See also Hess Corp. v. Schlumberger Technology Corp., Civil Action No. H-16-3415, 2017 WL 2829697 (S.D. Tex. June 29, 2017).

Schlumberger's argument is, in essence, that the SSVs were conforming. But that is for the trier of fact to determine. Hess may proceed with its claims based on the alleged non-conformity of the SSVs at the time of delivery. Hess may not proceed with its claims based on the failure of the SSVs to function after the warranty period had expired.[34]

On July 13, 2017, Schlumberger filed Schlumberger Technology Corporation's Answer, Affirmative Defenses and Counterclaim to Hess's Second Amended Complaint.[35] Among the affirmative defenses that Schlumberger asserts is an affirmative defense of release alleging that the MSC released Schlumberger "from all claims brought by any party for any and all 'damage to or loss of property'. [MSC] § 13."[36] Schlumberger also asserts a counterclaim for indemnity seeking to recover from Hess any judgment that Hess receives from Schlumberger on Hess's affirmative claim plus attorney's fees and costs.[37]

On May 9, 2018, Hess filed the TAC asserting claims for breach of contract pursuant to Texas common law and Texas Business and Commerce Code § 2.608.[38] Hess alleges that the SSVs containing the defective MSE seals were non-conforming goods and that the

---

[34]Memorandum Opinion and Order, Docket Entry No. 40, p. 17. See also Hess, 2017 WL 2829697, *7.

[35]Docket Entry No. 43.

[36]Id. at 18.

[37]Id. at 18-21.

[38]TAC, Docket Entry No. 71, pp. 29-31 ¶¶ 92-104 (breach of contract pursuant to Texas Business and Commerce Code ¶ 2.608), and pp. 31-32 ¶¶ 105-109 (breach of contract).

non-conformities substantially impaired the value of the SSVs to Hess. Hess alleges that it "incurred substantial expense to retrieve and replace the non-conforming valves and restore the wells to production, and lost profits from deferred and lost production."[39] Hess also alleges:

> Schlumberger's failure to perform its manufacturing and inspections according to the applicable contractual specifications and standards has resulted in significant damages to Hess, including but not limited to costs associated with retrieval and replacement of the failed Schlumberger Safety Valves and restoration of the wells, and lost profits from deferred and lost production.[40]

Hess reasserts the prayer for relief from its Original Complaint seeking the cost of cover for each valve, incidental damages, consequential damages, attorney's fees and expenses, costs of suit, pre- and post-judgment interest, and all other relief, equitable and legal, to which Hess is justly entitled.[41]

On April 8, 2019, the parties submitted a Joint Status Report Concerning Trial (Docket Entry No. 114), stating: "[T]he parties have agreed to try this case to the bench rather than a jury."

## III.  **Standard of Review**

Summary judgment is authorized if the movant establishes that there is no genuine dispute about any material fact and the law entitles it to judgment. Fed. R. Civ. P. 56. Disputes about

---

[39]Id. at 31 ¶ 103.

[40]Id. at 32 ¶ 109.

[41]Id. at 32.

material facts are "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 106 S. Ct. 2505, 2511 (1986). A "party moving for summary judgment must 'demonstrate the absence of a genuine issue of material fact,' but need not negate the elements of the nonmovant's case." Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (quoting Celotex Corp. v. Catrett, 106 S. Ct. 2548, 2553 (1986)). "If the moving party fails to meet this initial burden, the motion must be denied, regardless of the nonmovant's response." Id. If, however, the moving party meets this burden, Rule 56 requires the nonmovant to go beyond the pleadings and show by admissible evidence that specific facts exist over which there is a genuine issue for trial. Id. "[T]he court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Products, Inc., 120 S. Ct. 2097, 2110 (2000). Factual controversies are to be resolved in favor of the nonmovant, "but only when there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Little, 37 F.3d at 1075.

"When parties file cross-motions for summary judgment, [courts] review 'each party's motion independently, viewing the evidence and inferences in the light most favorable to the nonmoving party.'" Cooley v. Housing Authority of the City of Slidell, 747 F.3d 295, 298 (5th Cir. 2014) (quoting Ford Motor Co.

v. Texas Department of Transportation, 264 F.3d 493, 498 (5th Cir. 2001)). See also Shaw Constructors v. ICF Kaiser Engineers, Inc., 395 F.3d 533, 538-39 (5th Cir. 2004), cert. denied sub nom. PCS Nitrogen Fertilizer, L.P. v. Shaw Constructors, Inc., 126 S. Ct. 342 (2005) ("Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law.").

## IV.  Applicable Law

Hess asserts claims for breach of contract pursuant to Texas common law and Texas Business and Commerce Code § 2.608.[42]  The court has already held that the two breach of contract claims Hess asserts are indistinguishable and that Chapter 2 of the Texas Business and Commerce Code provides the applicable law.[43]  Under Texas law "[i]f the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous and the court will construe the contract as a matter of law."  Coker, 650 S.W.2d at 393.  The parties do not dispute that Texas law applies to the contract, and neither party argues that any part of their contract is ambiguous.

---

[42]TAC, Docket Entry No. 71, pp. 29-31 ¶¶ 92-104 (breach of contract pursuant to Texas Business and Commerce Code ¶ 2.608), and pp. 31-32 ¶¶ 105-109 (breach of contract).

[43]Memorandum Opinion and Order, Docket Entry No. 40, p. 6 n.20. See also Hess, 2017 WL 2829697, *3 n.20.

Section 2.608 of the Texas Business and Commerce Code describes the conditions necessary for revocation:

> (a) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it . . .
>
> . . .
>
> (2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.
>
> (b) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.
>
> (c) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Tex. Bus. & Com. Code § 2.608. A seller delivers conforming goods when the goods "are in accordance with the obligations under the contract." Tex. Bus. & Com. Code § 2.106(b). Non-conformity includes any failure of the seller to perform according to his obligations under the contract, including breaches of warranties. See Tex. Bus. & Com. Code § 2.714, Comment 2. Breach of warranty is a subset of non-conformity. See Ford Motor Credit Co. v. Harper, 671 F.2d 1117, 1122 (8th Cir. 1982).

A claim for "revocation seeks to put the buyer in the same position as if he had rejected the goods at the time of delivery." Neal v. SMC Corp., 99 S.W.3d 813, 816 (Tex. App. — Dallas 2003, no pet.). See also A.O. Smith Corp. v. Elbi S.P.A., 123 F. App'x 617,

619 (5th Cir. 2005) (per curiam) ("[B]reach of contract damages are not available when a buyer accepts non-conforming goods. In that instance, breach of warranty is the remedy . . . Breach of contract remedies are available, however, to a buyer who, *inter alia*, properly revokes acceptance.") (citing <u>Selectouch Corp. v. Perfect Starch, Inc.</u>, 111 S.W.3d 830, 834 (Tex. App. — Dallas 2003, no pet.) ("A buyer who . . . justifiably revokes his acceptance may recover breach of contract remedies for delivery of non-conforming goods under section 2.711. . .")).

The remedies for breach of contract for a sale of goods are set forth in Tex. Bus. & Com. Code §§ 2.711-2.715. In pertinent part § 2.711 governing "Buyer's Remedies in General" provides:

> (a) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2.612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
>
> > (1) "cover" and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
> >
> > (2) recover damages for non-delivery as provided in this chapter (Section 2.713).

Tex. Bus. & Com. Code § 2.711.

Section 2.712 governing "Cover" provides:

> (a) After a breach within the preceding section the buyer may "cover" by making in good faith and without unreasonable delay any reasonable purchase of or contract to purchase goods in substitution for those due from the seller.

(b)   The buyer may recover from the seller as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages as hereinafter defined (Section 2.715), but less expenses saved in consequence of the seller's breach.

Tex. Bus. & Com. Code § 2.712.

Section 2.713 governing "Buyer's Damages for Non-Delivery or Repudiation" provides:

(a)   Subject to the provisions of this chapter with respect to proof of market price (Section 2.723), the measure of damages for non-delivery or repudiation by the seller is the difference between the market price at the time when the buyer learned of the breach and the contract price together with any incidental and consequential damages provided in this chapter (Section 2.715), but less expenses saved in consequence of the seller's breach.

(b)   Market price is to be determined as of the place for tender or, in cases of rejection after arrival or revocation of acceptance, as of the place of arrival.

Tex. Bus. & Com. Code § 2.713.

Section 2.715 governing "Buyer's Incidental and Consequential Damages" provides:

(a)   Incidental damages resulting from the seller's breach include expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

(b)   Consequential damages resulting from the seller's breach include

(1)   any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and

-20-

> (2) injury to person or property proximately resulting from any breach of warranty.

Tex. Bus. & Com. Code § 2.715. The effect of these provisions may be altered by agreement of the contracting parties. Tex. Bus. & Com. Code § 1.302(a) ("Except as otherwise provided . . . elsewhere in this title, the effect of provisions of this title may be varied by agreement.").

## V. <u>Schlumberger's Motion for Summary Judgment</u>

Schlumberger argues that it is entitled to summary judgment on Hess's breach of contract claims as to all four of the failed valves because (1) Hess expressly disclaimed its right to challenge non-conformities after a year, (2) Hess released Schlumberger from all of the claims asserted in this action, and (3) the contract was not breached because it prescribes processes, not product specifications.[44] Alternatively, Schlumberger argues that it is entitled to judgment on the Well B(2) valve claims pursuant to the January 1, 2017, Bridging Agreement[45] and on Hess's claims for workover costs and any lost-opportunity costs because Hess provides no evidence using the proper measure of damages.[46]

---

[44]STC's MSJ, pp. 11-20, Docket Entry No. 116, pp. 17-26.

[45]<u>Id.</u> at 20-22, Docket Entry No. 116, pp. 26-28.

[46]<u>Id.</u> at 22-25, Docket Entry No. 116, pp. 28-31.

**A. Schlumberger is Not Entitled to Summary Judgment on Hess's Breach of Contract Claims as to the Four Valves**

    1.   <u>Hess Did Not Expressly Disclaim the Right to Challenge the Alleged Non-Conformities After a Year</u>

Citing the one-year warranty provision contained in the MSC, and asserting that the MSC disclaims all "OTHER WARRANT[IES]" except those "EXPRESSLY STATED HEREIN,"[47] Schlumberger argues that it is entitled to summary judgment on all of Hess's claims because Hess expressly disclaimed its right to challenge non-conformities after a year.[48] Hess argues in response that Schlumberger's warranty argument "is essentially a two-year old cut-and-paste job that the Court already said would be disallowed,"[49] and that "[t]hat alone is reason to deny Schlumberger's motion."[50] Alternatively, Hess argues that

> [o]n the merits, Schlumberger's argument has lost even further ground. Hess alleges that it properly revoked acceptance and therefore never finally accepted Schlumberger's tender of safety valves that failed to conform at delivery to the independent contractual obligations contained in the Commercial Agreement. Schlumberger's own documents repeatedly confirm this allegation as true. Because Hess has properly revoked acceptance, its claim sounds in contract and not warranty.[51]

---

[47]<u>Id.</u> at 13, Docket Entry No. 116, p. 19.

[48]<u>Id.</u> at 11, Docket Entry No. 116, p. 17.

[49]Hess Corporation's Response in Opposition to Schlumberger Technology Corporation's Motion for Summary Judgment ("Hess's Response in Opposition to STC's MSJ"), p. 9, Docket Entry No. 127, p. 17.

[50]<u>Id.</u>

[51]<u>Id.</u>

Quoting <u>Neal</u>, 99 S.W.3d at 816, Hess argues that "[u]nder Texas law, Hess must be put 'in the same position as if [it] had rejected the goods at the time of delivery.'"[52]

### (a) The Court's Prior Ruling Does Not Foreclose Any Aspect of Schlumberger's MSJ

Schlumberger argues that it is entitled to summary judgment on Hess's claims because the non-conformities for which Hess seeks relief are violations of express warranties and as such are subject to the MSC's one-year warranty provision. Although Schlumberger raised similar arguments in a previously denied motion to dismiss, <u>see Hess</u>, 2017 WL 2829697, at *6-*7, the court's prior ruling does not foreclose any aspect of Schlumberger's present motion for summary judgment. The court's prior ruling accepted Hess's allegations as true, viewed them in the light most favorable to Hess, and analyzed the facts alleged in Hess's complaint against the elements of a claim for revocation under Tex. Bus. & Com. Code § 2.608. Recognizing that "[t]he question before the court on a motion to dismiss is whether Hess has plausibly alleged that Schlumberger's SSVs were non-conforming at the time of delivery," <u>id.</u> at *6, the court concluded that "Hess's claim is plausible" because Hess alleged that Schlumberger's failure to fulfill its contractual obligations resulted in delivery of non-conforming SSVs, and that "Schlumberger's contractual obligation to deliver

---

[52]<u>Id.</u> at 10, Docket Entry No. 127, p. 18.

[conforming, _i.e.,_] parts . . . is not time limited." _Id._ at *7.

The court's prior ruling does not foreclose any aspect of STC's MSJ because that ruling was based on the Plaintiff's Second Amended Complaint, which has been superseded by the TAC, and was entered before the court had considered the summary judgment evidence.

> (b)  Whether Hess's Revocation Claims Are Time-Barred is a Fact Issue for Trial

Hess alleges that it justifiably revoked its initial acceptance of the four SSVs under Texas Business and Commerce Code § 2.608 because the SSVs "failed to conform at delivery to the independent contractual obligations contained in the Commercial Agreement."[53]  The elements of a revocation claim are:

> (1) initial acceptance (. . . without discovery of the non-conforming item if acceptance was induced by difficulty of discovery or by seller's assurance); (2) of non-conforming item; (3) such non-conformity substantially impairs the value to the buyer; (4) and revocation occurs within a reasonable time; (5) in any event, the revocation must occur before a substantial change in the condition of the goods occurs (which change is not caused by defect of the goods).

_Neily v. Aaron,_ 724 S.W.2d 908, 913-14 (Tex. App. — Fort Worth 1987, no writ).  "The determination of each of these elements is a question of fact."  _Id._ at 914 (citing _Vista Chevrolet v. Lewis,_ 704 S.W.2d 363, 368 (Tex. App. — Corpus Christi 1985), _rev'd on other grounds,_ 709 S.W.2d 176 (Tex. 1986)).

Distinguishing the argument now being made in its MSJ from the argument advanced in its previous motion to dismiss, Schlumberger

---

[53]_Id._ at 9, Docket Entry No. 127, p. 17.

argues that "this Court thus far has construed only the MSC warranty's *performance* language and has not construed the nonconformity provision in the warranty."[54]  Asserting that the MSC's warranty provision governs both performance and conformity, Schlumberger argues

> Hess suggests that this Court has already ruled on the warranty argument Schlumberger asserts in Section I.A of its summary judgment motion, but Hess is mistaken. Tellingly, Hess does not dispute that this Court thus far has construed only the MSC warranty's *performance* language and has not construed the nonconformity provision in the warranty.  At the pleading stage, the Court dismissed Hess's "allegations [that] involve the failure of the [valves] to perform as expected."  ECF No. 40 at 16.  "[A]s the disclaimers in the MSC make clear," the Court held, "Schlumberger did not warrant that the valves would do so indefinitely.  Schlumberger explicitly warranted performance . . . for one year only."  *Id.*  Hess pressed the Court to construe only this part of the warranty, stating — incorrectly — that "[t]he MSC's warranty provision does not mention Schlumberger's specifications."  ECF No. 34 at 29.  Today, however, Hess does not dispute that the warranty does just that, promising that the valves would "be free from defects in design, materials, fabrication and other workmanship" and **conform to [the] specifications**, drawings or other descriptions contained in the applicable service agreement, purchase order, work order or other project document." . . . (emphasis added).  Hess does not dispute that it did not raise the alleged nonconformities within one year.  That resolves all of Hess's claims.[55]

Citing <u>Gasmark, Ltd. v. Kimball Energy Corp.</u>, 868 S.W.2d 925, 928 (Tex. App. — Fort Worth 1994, no writ), for its statement that "the effect of the UCC may be varied by agreement," Schlumberger argues

---

[54]Defendant Schlumberger Technology Corporation's Reply in Support of Its Motion for Summary Judgment ("STC's Reply in Support of MSJ"), p. 3, Docket Entry No. 144, p. 10.

[55]<u>Id.</u> (emphasis added).

"[t]hat is exactly what the parties' contract does here. Hess agreed not to bring nonconformity claims after a year, and promised that there were 'NO OTHER WARRANT[IES].'"[56] Schlumberger's argument that Hess's revocation claims are precluded by the MSC warranty provision's one-year limitation challenges Hess's ability to establish element (4) of its revocations claims, *i.e.*, that the revocation occurred within a reasonable time.[57]

Hess argues that the SSVs "failed to conform at delivery to the independent contractual obligations contained in the Commercial Agreement,"[58] specifically, that the SSVs would be manufactured, tested, and monogrammed to the latest edition of API 14A, and would conform to Hess's and Schlumberger's specifications and to industry standards.[59] Schlumberger's contractual obligation to provide Hess with SSVs that would be manufactured, tested, and monogrammed to the latest edition of API 14A, and would comply to Hess's and Schlumberger's specifications and to industry standards, are express warranties because they are affirmations of fact, promises, and/or descriptions related to the SSVs that became part of the basis of the parties' bargain. See Tex. Bus. & Com. Code § 2.313

---

[56]Id. at 4, Docket Entry No. 144, p. 11.

[57]Hess has not moved for summary judgment on this or any other element of its revocation claims.

[58]Hess's Response in Opposition to STC's MSJ, p. 9, Docket Entry No. 127, p. 17.

[59]TAC, Docket Entry No. 71, pp. 21-27 ¶¶ 66-80.

and Comment 5.[60]  The concept of non-conformity includes any failure

of the seller to perform according to his obligations under the

contract, including breaches of warranties.  <u>See</u> Texas Business and

Commerce Code § 2.714, Comment 2.  <u>See also  Ford</u>, 671 F.2d at 1122

(recognizing breach of warranty as a subset of non-conformity).

Section 2.316(d) of the Texas Business and Commerce Code

states that "[r]emedies for breach of warranty can be limited in

accordance with the provisions of this chapter on liquidation or

---

[60]Section 2.313 to the Texas Business and Commerce Code governs
express warranties and states in pertinent part:

(a)    Express warranties by the seller are created as
       follows:

    (1)    Any affirmation of fact or promise made by the
           seller to the buyer which relates to the goods
           and becomes part of the basis of the bargain
           creates an express warranty that the goods
           shall conform to the affirmation or promise.

    (2)    Any description of the goods which is made
           part of the basis of the bargain creates an
           express warranty that the goods shall conform
           to the description.

    (3)    Any sample or model which is made part of the
           basis of the bargain creates an express
           warranty that the whole of the goods shall
           conform to the sample or model.

(b)    It is not necessary to the creation of an express
       warranty that the seller use formal words such as
       "warrant" or "guarantee" or that he have a specific
       intention to make a warranty, . . .

Comment 5 to this section recognizes that "[a] description need not
be by words.  Technical specifications, blueprints and the like can
afford more exact description than mere language and if made part
of the basis of the bargain goods must conform with them."

limitation of damages and on contractual modification of remedy (Section 2.718 and 2.719)." Schlumberger's obligation to deliver SSVs that conformed to express warranties is covered in the MSC's warranty provision, which provides in pertinent part:

> Contractor warrants that all equipment, products, materials and other items furnished hereunder shall: . . . (2) be free from defects in design, materials, fabrication and other workmanship; and (3) conform to AHC's [Amerada Hess Corporation's] specifications, drawings or other descriptions contained in the applicable service agreement, purchase order, work order or other project document.[61]

The MSC's warranty provision also covers "all work and other services performed" by stating:

> Contractor warrants that all work and other services performed hereunder (whether by Contractor, its subcontractors or other parties for whom it is responsible) shall be free from all faults and defects and of a quality consistent with the prevailing standards of workmanship for experienced contractors with expertise in the particular type of work or service being performed.[62]

The MSC's warranty provision limits Schlumberger's warranties to a period of one year by stating:

> Contractor's foregoing warranties shall continue for a period of one (1) year after Contractor's delivery and/or installation (if performed by Contractor) of the equipment, product, materials or other item in question or performance of other applicable work or services, as the case may be. . . .[63]

The MSC's warranty provision expressly and conspicuously disclaims all other express or implied warranties:

---

[61]MSC, Exhibit 1 - Tab 3 to Plaintiff's Second Amended Complaint, Docket Entry No. 25-3, p. 3 § 2(a).

[62]Id.

[63]Id. at 4.

[SCHLUMBERGER] MAKES NO OTHER WARRANTY AS TO PRODUCTS, WORKMANSHIP OR MERCHANTABILITY, WHETHER EXPRESSED OR IMPLIED (INCLUDING, WITHOUT LIMITATION, THAT THE PRODUCTS OR SERVICES SHALL BE FIT FOR ANY PARTICULAR PURPOSE), EXCEPT AS EXPRESSLY STATED HEREIN OR IN AN EXPRESS AMENDMENT HERETO.[64]

---

[64]The full text of the warranty provision is as follows:

(a) Upon Company notifying Contractor of the services, products, equipment, materials or other items desired, Contractor will commence furnishing same at the agreed upon time, and continue such operations diligently and without delay, in strict conformity with the specifications and requirements contained herein and in any applicable work order, purchase order, service agreement or other project document.

Contractor warrants that all equipment, products, materials and other items furnished hereunder shall: (1) be new if specified by Company; (2) be free from defects in design, materials, fabrication and other workmanship; and (3) conform to AHC's specifications, drawings or other descriptions contained in the applicable service agreement, purchase order, work order or other project document. Contractor warrants that all work and other services performed hereunder (whether by Contractor, its subcontractors or other parties for whom it is responsible) shall be free from all faults and defects and of a quality consistent with the prevailing standards of workmanship for experienced contractors with expertise in the particular type of work or service being performed. In the event of a breach of any of the foregoing warranties, Contractor shall, promptly after receipt of written notice thereof from Company and at Contractor's sole cost, repair or replace (as determined by Contractor) all applicable equipment, products, materials, work, services, and other items necessary to cure the breach of warranty, as confirmed by Company, whose approval shall not be unreasonably withheld.

If Contractor does not promptly correct or replace such defective or non-conforming equipment, products, materials, work, services or other items in accordance with the foregoing warranties within a reasonable time, as specified in Company's written notice, Company may have the warranty deficiency or non-conformity corrected

(continued...)

Hess alleges that it "did not limit its rights of revocation under [§] 2.608 in its agreements with Schlumberger[; t]hose rights exist at law and are nowhere modified by any agreement with Schlumberger."[65] But Hess neither alleges in its live complaint, nor argues in its summary judgment briefing that the MSC's warranty provision is unenforceable or unreasonable under § 2.316 or any other provision of the Texas Business and Commerce Code.

Schlumberger argues that the MSC warranty provision represents the parties' agreement to limit to one year the time that Hess had to challenge non-conformity with the contract's express

---

[64](...continued)
or replaced by another contractor, and all of Company's costs incurred in the performance and/or remedying of such defective work (including compensation for work and services performed and/or materials, products, equipment and other items furnished by other contractors) shall be charged against the Contractor pursuant to a deductive change order, to the extent that such additional costs incurred by Company to cure Contractor's breach do not exceed the applicable project price otherwise payable to Contractor. Contractor's foregoing warranties shall continue for a period of one (1) year after Contractor's delivery and/or installation (if performed by Contractor) of the equipment, product, materials or other item in question or performance of other applicable work or services, as the case may be; provided that with regard to all replacement, repair or other corrective work pursuant to a breach of warranty, Contractor's warranty shall continue for an additional year after completion of same. **CONTRACTOR MAKES NO OTHER WARRANTY AS TO PRODUCTS, WORKMANSHIP OR MERCHANTABILITY, WHETHER EXPRESSED OR IMPLIED (INCLUDING, WITHOUT LIMITATION, THAT THE PRODUCTS OR SERVICES SHALL BE FIT FOR ANY PARTICULAR PURPOSE), EXCEPT AS EXPRESSLY STATED HEREIN OR IN AN EXPRESS AMENDMENT HERETO.**

Id.

[65]TAC, Docket Entry No. 71, p. 31 ¶ 104.

warranties.[66]    Schlumberger's argument — that the MSC warranty provision's one-year limitation represents the time to which the parties agreed non-conformities could be challenged — does not preclude Hess from obtaining relief under § 2.608 merely because Hess failed to revoke within the one-year period.

Comment 4 to § 2.608 provides:

> Subsection (2) requires notification of revocation of acceptance within a reasonable time after discovery of the grounds for such revocation.  Since this remedy will be generally resorted to only after attempts at adjustment have failed, **the reasonable time period should extend in most cases beyond the time in which notification of breach must be given, beyond the time for discovery of non-conformity after acceptance** and beyond the time for rejection after tender.  The parties may by their agreement limit the time for notification under this section, . . . (emphasis added).

Accepting Schlumberger's contention that the MSC warranty provision's one-year limitation represents the time in which the parties agreed non-conformity with an express warranty could be challenged, pursuant to Comment 4 the "reasonable time period" that § 2.608 provides for revocation "should extend in most cases beyond the time in which notification of breach must be given, [and/or] beyond the time for discovery of non-conformity after acceptance."  Under the facts of this case that means that § 2.608's "reasonable time period" may extend beyond the MSC warranty provision's one-year period.  Although Comment 4 recognizes that "[t]he parties may by their agreement limit the time for notification under this

_____

[66]STC's MSJ, p. 11, Docket Entry No. 116, p. 19.

section . . ," _id._, neither the MSC warranty provision nor any other provision of the parties' contract expressly limits the time for revocation under § 2.608.  While Hess did disclaim the time to challenge non-conformities to one year, Hess did not disclaim the time to revoke under § 2.608 to one year.  Accordingly, the court concludes that Hess was only obligated to notify Schlumberger of its revocation of the SSVs reasonably soon after the agreed-upon one-year period expired.  Whether Hess can satisfy the fourth element of its revocation claims for the four SSVs by establishing that its revocations occurred within a reasonable time are questions of fact for trial.  _See Neily,_ 724 S.W.2d at 914 ("The determination of each . . . element[ of a § 2.608 claim] is a question of fact.").

If, as Hess alleges, Hess justifiably revoked acceptance of the SSVs, Hess would have the same rights as if it had rejected the SSVs at the time of delivery, including the right to damages for breach of contract.  _See Neal,_ 99 S.W.3d at 816 (citing Tex. Bus. & Com. Code § 2.608).  _See also A.O. Smith,_ 123 F. App'x at 619 ("Breach of contract remedies are available . . . to a buyer who . . . properly revokes acceptance.").  Whether Hess justifiably revoked acceptance of the SSVs is a fact issue for trial that precludes the court from granting Schlumberger's MSJ on Hess's breach of contract claims for the four valves.  _Neily,_ 724 S.W.2d at 914.

2.  <u>Schlumberger Is Entitled to Partial Summary Judgment
    Based on the MSC's Indemnity and Release Provisions</u>

Citing § 13(c) of the MSC, Schlumberger argues that it is
entitled to summary judgment because Hess released it from all
claims for property damage.  Schlumberger argues that

> [a]s is "customary practice" in the oil-and-gas industry,
> Hess and Schlumberger agreed to release and indemnify
> each other for property damage claims tied to work
> performed under the [MSC]. . . . This "knock-for-knock"
> agreement requires each party to assume responsibility
> for damage to its property, regardless of who caused the
> damage.  In the MSC's knock-for-knock provision, Hess
> "fully release[d]" Schlumberger as follows:
>
>> [Hess]   shall   *fully   release* . . .
>> [Schlumberger] . . . from . . . *all claims*
>> brought by . . . any party or person, for any
>> and all . . . *damage to or loss of property* of
>> [Hess] . . . whether real or personal
>> (including, without limitation, *production and
>> drilling equipment,* wellbore, casing,
>> subsurface reservoirs and any oil and gas or
>> other hydrocarbon substances located therein)
>> whenever and wherever occurring, arising
>> directly or indirectly out of or in any way
>> involving [Schlumberger's] work and other
>> operations (including acts and omissions)
>> . . . *without limit and regardless of cause or
>> fault* . . . .
>
> Ex. 1 at § 13(c) (emphasis added; all-caps omitted).
>
> Under this broadly worded provision, Schlumberger is
> released "without limit" for "loss of property" "whether
> real or personal." . . . Though not defined in the MSC,
> real property includes "[l]and and anything growing on,
> attached to, or erected on it."  Black's Law Dictionary
> (10th ed. 2014) (entry for "property").   Personal
> property is "[a]ny moveable or intangible thing that is
> subject to ownership and not classified as real property"
> (*id.*); it includes money (*San Antonio Area Found. v.
> Lang*, 35 S.W.3d 636, 640 (Tex. 2000)).

Hess's alleged damages all constitute "damage to or loss of property." Ex. 1 at § 13(c)(1)(iii). According to Hess's expert, Hess's damages fall into four categories:

(1) costs "to purchase replacements for the failed [valves]";

(2) "costs for the retrieval and replacement of the [valves]";

(3) "reduced revenues associated with work on the Gulfstar One facility"; and

(4) costs "due to methanol contamination."

Ex. 7 at ¶ 9. "Costs" and "reduced revenues" are of course lost money, which, again, is intangible property. At the same time, each category also involves lost tangible property.[67]

Citing Energy XXI, GoM, LLC v. New Tech Engineering, L.P., 787 F. Supp. 2d 590 (S.D. Tex. 2011), and Valero Energy Corp. v. M.W. Kellogg Construction Co., 866 S.W.2d 252 (Tex. App. — Corpus Christi 1993, writ denied), Schlumberger argues that courts regularly enforce such releases.[68]

Hess responds that Schlumberger is not entitled to summary judgment because its claims do not allege "damage to or loss of" Hess's property, and because it did not release Schlumberger from its breach of contract claim.[69] Arguing that the MSC's indemnity and release provisions do not apply to claims alleging breach of

---

[67]STC's MSJ, pp. 13-14, Docket Entry No. 116, pp. 19-20 (citing Exhibit 7, Pulliam Report, ¶ 9, Docket Entry No. 116-7, ¶ 9).

[68]Id. at 15, Docket Entry No. 116, p. 21.

[69]Hess's Response in Opposition to STC's MSJ, pp. 10-14, Docket Entry No. 127, pp. 18-22.

the underlying contract,[70] Hess has moved for partial summary judgment.[71]

Section 13 of the MSC governs "Indemnities," and in pertinent part provides:

(c)   <u>Company's Indemnity Obligations</u>:

    1.   COMPANY SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD CONTRACTOR GROUP HARMLESS FROM AND AGAINST ALL CLAIMS BROUGHT BY OR ON BEHALF OF ANY PARTY OR PERSON, FOR ANY AND ALL:

    . . .

    (iii)   DAMAGE TO OR LOSS OF PROPERTY OF COMPANY AND ITS EMPLOYEES, WHETHER REAL OR PERSONAL (INCLUDING, WITHOUT LIMITATION, PRODUCTION AND DRILLING EQUIPMENT, WELLBORE, CASING, SUBSURFACE RESERVOIRS AND ANY OIL AND GAS OR OTHER HYDROCARBON SUBSTANCES LOCATED THEREIN) WHENEVER AND WHEREVER OCCURRING, ARISING DIRECTLY OR INDIRECTLY OUT OF OR IN ANY WAY INVOLVING CONTRACTOR'S WORK . . . EQUIPMENT, TOOLS, MATERIALS, AND OTHER ITEMS WHATSOEVER FURNISHED, DELIVERED, STORED, OR OTHERWISE HANDLED BY CONTRACTOR . . . WITHOUT LIMIT AND REGARDLESS OF CAUSE OR FAULT, AS PARTICULARLY DESCRIBED IN SECTION 13(b) ABOVE.[72]

Section 13(c) is informed by § 13(b), which provides:

IT IS THE SPECIFIC AND EXPRESSED INTENT AND AGREEMENT OF THE COMPANY AND THE CONTRACTOR THAT ALL RELEASE, DEFENSE,

---

[70]<u>Id.</u> at 10, Docket Entry No. 127 at 18.   <u>See also id.</u> at n.5 (stating "Hess previously raised the Texas Oilfield Anti-Indemnity Act as a defense.   ECF No. 75, at 3.   Under Hess's current understanding of Schlumberger's indemnity counterclaim, Hess withdraws this defense.").

[71]<u>See</u> Hess's MPSJ, Docket Entry No. 118, and § VI, herein.

[72]MSC, § 13, Docket Entry No. 25-3, pp. 7-8.

HOLD HARMLESS AND INDEMNITY OBLIGATIONS AND OTHER
LIABILITIES ASSUMED BY COMPANY AND CONTRACTOR
RESPECTIVELY UNDER SECTIONS 13(c) AND (d) SHALL BE
WITHOUT REGARD TO THE NEGLIGENCE (WHETHER SOLE, JOINT, OR
CONCURRENT, ACTIVE OR PASSIVE), BREACH OF WARRANTY,
STRICT LIABILITY, PREMISES LIABILITY, DEFECTIVE CONDITION
(WHETHER PRE-EXISTING OR OTHERWISE) OF ANY FACILITIES,
EQUIPMENT, MATERIALS, TOOLS, OR OTHER ITEM WHATSOEVER
. . . OR ANY OTHER FAULT OF THE INDEMNIFIED PARTIES OR
ANY OTHER PARTY EXCEPTING ONLY THE GROSS NEGLIGENCE,
RECKLESSNESS OR WILLFUL MISCONDUCT OF COMPANY GROUP OR
CONTRACTOR GROUP.[73]

"Under Texas law a release is a contract." Williams v. Glash, 789 S.W.2d 261, 264 (Tex. 1990). The court's primary concern is to ascertain the true intentions of the parties as expressed in the instrument. Coker, 650 S.W.2d at 393. "The language in an agreement is to be given its plain grammatical meaning unless to do so would defeat the parties' intent." DeWitt County Electric Cooperative, Inc. v. Parks, 1 S.W.3d 96, 101 (Tex. 1999). Undefined terms in a contract are given their commonly understood or generally accepted meanings. See Lamar Homes, Inc. v. Mid-Continent Casualty Co., 242 S.W.3d 1, 8 (Tex. 2007).

       (a)   Replacement Valve Cost Is Not "Damage To or Loss of" Hess's Property

If Hess justifiably revoked acceptance of the SSVs, by operation of law title revested in the seller, Schlumberger, Tex. Bus. & Com. Code § 2.401(d),[74] and Hess would have the same rights

---

[73]Id. at 7.

[74]Section 2.401(d) of the Texas Business and Commerce Code states in pertinent part: "[A] justified revocation of acceptance revests title to the goods in the seller. Such revesting occurs by operation of law and is not a 'sale.'"

and duties with regard to the SSVs as if it had rejected them. Tex. Bus. & Com. Code § 2.608(c). See also Neal, 99 S.W.3d at 816 ("[R]evocation seeks to put the buyer in the same position as if he had rejected the goods at the time of delivery. . . Revocation cancels a contract of sale and returns the goods to the seller and the purchase price to the buyer. . . It places the parties in the same position as before the sale."); Delhomme Industries, Inc. v. Houston Beechcraft, Inc., 735 F.2d 177, 181 (5th Cir. 1984) ("Revocation of acceptance by a buyer under the UCC is necessarily a recognition by the buyer that the property [as to which acceptance is revoked] belongs to the seller.") (internal quotation marks and citation omitted). A buyer who justifiably revokes acceptance may, in addition to recovering the price paid, cover by purchasing goods in substitution for those due from the seller, and recover as damages the difference between the cost of cover and the contract price together with any incidental or consequential damages. Tex. Bus. & Com. Code §§ 2.711-2.712, and 2.715 (defining incidental and consequential damages). If Hess justifiably revoked acceptance of the SSVs, and title revested in Schlumberger by operation of law, the costs that Hess incurred to purchase replacements for the failed SSVs could not be subject to the MSC's indemnity provision because those costs would not constitute "damage to or loss of" Hess's property. Accordingly, the court concludes that Schlumberger is not entitled to summary judgment on these damages based on the MSC's indemnity provision.

      (b)   Costs to Retrieve and Replace the SSVs Are Not "Damage[s] to or Loss of" Hess's Property

Citing the Failure Analysis Report prepared by Hess's expert, Barry Pulliam, Schlumberger argues that

> according to Hess, a valve defect caused the valves to "close[]" so they "could not be reopened" and became "non-functional." E.g., ECF No. 71 at ¶¶ 44-45. That failure allegedly caused other well equipment to fail, and the wells to "cease[] production." Ex. 10 at 4. The defect therefore caused "damage to or loss of property," including to the valves and other production equipment.[75]

Citing <u>Bay Rock Operating Co. v. St. Paul Surplus Lines Insurance Co.</u>, 298 S.W.3d 216, 230 (Tex. App. — San Antonio 2009, pet. denied), <u>Mid-Continent Casualty Co. v. Bay Rock Operating Co.</u>, No. SA-07-CA-274-OG, 2009 WL 5341825, at *2 (W.D. Tex. Sept. 30, 2009), <u>Energy EXXI</u>, 787 F. Supp. 2d at 598, and <u>Valero</u>, 866 S.W.2d at 257, Schlumberger argues courts have held that similar damages are "property damage."[76]

Hess does not allege, and Schlumberger has not cited facts establishing, that the costs Hess expended to retrieve and replace the failed SSVs constitute "damage to or loss of" Hess's property. Hess alleges:

> The non-conforming Schlumberger Safety Valves in Wells B, C, and D failed and as a result, production from each of Wells B, C, and D had to be shut in. Hess incurred substantial expense to retrieve and replace the non-conforming valves and restore the wells to production, and lost profits from deferred and lost production.[77]

---

[75] STC's MSJ, pp. 14-15, Docket Entry No. 116, pp. 20-21.

[76] <u>Id.</u> at 15, Docket Entry No. 116, p. 21.

[77] TAC, Docket Entry No. 71, p. 31 ¶ 103.

Schlumberger replies that the SSVs themselves suffered physical damage when they failed, blocked production, and needed to be replaced.[78] Asserting that "the valves 'failed' and needed to be replaced," Schlumberger argues "[t]hat was a loss of 'production and drilling equipment,' which is expressly covered by the knock-for-knock provision."[79] Citing Energy EXXI, 787 F. Supp. 2d at 605-08, Schlumberger argues that "at least one court in this district has interpreted similar language to cover the costs of repairing defective work without imposing any separate physical injury requirement."[80]

As explained in § IV.A.2(a), above, if Hess justifiably revoked acceptance of the SSVs, and title in the SSVs revested in Schlumberger by operation of law, the costs that Hess incurred to retrieve and replace the SSVs would not constitute "damage to or loss of" Hess's property. Schlumberger argues that even if the SSVs revested in Schlumberger, "it would not matter because the valves were still Hess's property upon delivery, which is when Hess contends that Schlumberger breached the contract."[81] The court is not persuaded by this argument because it contradicts the law of revocation and is not supported by any authority. See Tex. Bus. &

───────────────

[78]STC's Reply in Support of MSJ, p. 5, Docket Entry No. 144, p. 12.

[79]Id.

[80]Id. at 6, Docket Entry No. 144, p. 13.

[81]Id. at 5, Docket Entry No. 144, p. 12.

Com. Code § 2.608(c) ("A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them."); Neal, 99 S.W.3d at 816 ("revocation seeks to put the buyer in the same position as if he had rejected the goods at the time of delivery").

In addition, the cases Schlumberger cites in support of its argument that the costs Hess expended to retrieve and replace the SSVs constitute "damage to or loss of" Hess's property are inapposite because none of those cases involved retrieving and replacing a non-conforming good whose acceptance had been revoked. Instead, the cases Schlumberger cites involved disputes in which the plaintiffs were seeking relief for physical damage to tangible property such as an oil well damaged by a blow out and fire, Bay Rock Operating, 298 S.W.3d at 220, and Mid-Continent Casualty, 2009 WL 5341825; an oil well damaged by blocked tubing, Energy EXXI, 787 F. Supp. 2d at 598; and a plant damaged by a machine's explosion, Valero, 866 S.W.2d at 253.

Mid-Continent Casualty, 2009 WL 5341825, involved a dispute over whether damages arising from a blow out that caused an oil rig to burn were economic damages or property damages covered under an insurance policy that defined "property damage" as "physical injury to tangible property, including all resulting loss of use of that property . . . or loss of use of tangible property that is not physically injured." Id. at *3. Plaintiffs sought damages arising from a blowout, "including but not limited to 'repair, completion

and evaluation of the well, well control, lost gas sales and redrill of the well,'" id. at *4, and the court held that those damages were property damages covered by the policy. Id. at *5. The insurance policy at issue in Mid-Continent Casualty defined "property damage" broadly to include not just damage to tangible property but also loss of the property's use, and the court's holding was based in part on the observation that "[w]hen there is an injury to property, the tortfeasor must pay all economic *losses* that flow from that injury." Id. at *4.

Schlumberger's reliance on Energy EXXI, 787 F. Supp. 2d at 605-08, is misplaced because while that court interpreted similar indemnity language to cover costs of repairing defective work, in holding that the indemnity clause covered breach of contract claims and did not render the Good and Workmanlike Manner Clause meaningless, the court explained that

> [t]he indemnity provision makes Energy XXI responsible for "*property damage of, personal injury to, or death of* Energy XXI and any of Energy XXI employees." . . . Here, the injury associated with the alleged breach of the Good and Workmanlike Manner Clause is property damage. There are, however, certainly scenarios in which New Tech could breach the Good and Workmanlike Manner Clause that do not fall under the indemnity provision. For instance, if a breach of the Good and Workmanlike Manner Clause resulted only in economic loss as opposed to property damage, personal injury, or death, Energy XXI may have a valid claim for breach, and New Tech would not be protected by the Indemnity Clause. Thus, the court's interpretation of the Indemnity Clause as requiring indemnity in this case does not render the Good and Workmanlike Manner Clause meaningless in all cases.

Energy XXI, 787 F. Supp. 2d at 608.

Unlike the plaintiffs in the cases on which Schlumberger relies who were seeking relief for physical damage to tangible property, Hess asserts that "Hess's wells suffered no damage, and that non-existent damage did not cause them to shut down."[82] Hess is seeking relief for economic losses caused by Schlumberger's alleged breaches of contract. See Bass v. City of Dallas, 34 S.W.3d 1, 9 (Tex. App. — Amarillo 2000, no pet.) (distinguishing between damages for economic losses available in contract actions and damages for property losses available in tort actions). "'Economic loss' has been defined as 'damages for inadequate value, costs of repair and replacement of the defective product, or consequent loss of profits — *without any claim of personal injury or damage to other property* . . .'" Id. (quoting Thomson v. Espey Huston & Associates, Inc., 899 S.W.2d 415, 421 (Tex. App. — Austin 1995, no writ)). See also Black's Law Dictionary 589 (9th ed. 2009) (defining "economic loss" as "[a] monetary loss such as lost wages or lost profits"). Schlumberger has not cited evidence establishing as a matter of law that Hess's claims for costs incurred to retrieve and replace the SSVs and restore the wells to production are claims for "damage to or loss of" Hess's property instead of claims for economic loss. See United States Steel Corp. v. John H. Young, Inc., No. 03-16-00206-CV, 2018 WL 911861, at *4 (Tex. Civ. App. — Austin, Feb. 16, 2018, no pet.) (holding economic

---

[82]Hess's Response in Opposition to STC's MSJ, p. 12 n.10, Docket Entry No. 127, p. 20 n.10.

loss rule barred recovery for damages because the "subject matter of this dispute is the defective . . . [oil well] casing provided by [defendant] under its contract with [plaintiff], and the damages [plaintiff] incurred flowed from that contract . . . [plaintiff] suffered no damage beyond economic losses"). Accordingly, the court concludes that the MSC's indemnity provision does not entitle Schlumberger to summary judgment on Hess's claims for costs to retrieve and replace the SSVs and to restore the wells to production.

### (c) Lost Profits Are Not "Damage to or Loss of" Hess's Property

Citing the Pulliam Report Schlumberger asserts that Hess argues that "if the safety valves here had not failed, its production rates 'would have been higher, resulting in higher payments from Gulfstar One.'"[83] Citing <u>Bay Rock Operating,</u> 298 S.W.3d at 230, Schlumberger argues that "Hess seeks to recover for harms caused by its wells being damaged and shutting down — which are classic property damages."[84] Hess responds that its claim for $5.24 million in lost profits does not call for "damage to or loss" of Hess property.[85]

---

[83]STC's MSJ, p. 16, Docket Entry No. 116, p. 22 (quoting Pulliam Report, p. 9 ¶ 29, Exhibit 7 to STC's MSJ, Docket Entry No. 116-7, p. 12 ¶ 29).

[84]<u>Id.</u>

[85]Hess's Response in Opposition to STC's MSJ, p. 12, Docket Entry No. 127, p. 20. Although the Pulliam Report refers to lost revenues, these damages are apparently meant to measure Hess's lost profits.

In Bay Rock Operating after pressure pushed drilling mud into the formation, causing the well to blow out and the rig to burn, the leasee's insurance company asserted inter alia a negligence claim against the company hired to design and drill the well for "damages arising from the blowout, including but not limited to 'repair, completion and evaluation of the well, well control, lost gas sales and redrill of the well.'" 298 S.W.3d at 230. The court held that the damages at issue were "clearly property damages." Id. at 230. Bay Rock Operating involved the same facts as and was a companion case to Mid-Continent Casualty, 2009 WL 5341825, discussed and distinguished in § IV.A.2(b), above. The court concludes therefore that Bay Rock Operating is inapposite and that Hess's claim for reduced revenues are claims for economic — not property — damages. See Black's Law Dictionary 589 (9th ed. 2009) (defining "economic loss" as "[a] monetary loss such as lost wages or lost profits"). Accordingly, the court concludes that the MSC's indemnity provision does not entitle Schlumberger to summary judgment on Hess's claims for reduced revenues.

> (d)  Methanol Contamination is "Damage to or Loss of" Hess's Property

Citing the Pulliam Report, Schlumberger asserts that Hess injected methanol into the wells in an attempt to re-open the SSVs after they failed, that the methanol contaminated the oil in the wells, that when oil is contaminated it is damaged, and asserting that under the release "property" includes "any oil and gas,"

Schlumberger argues that the costs Hess incurred due to methanol contamination is "damage to or loss of" Hess's property.[86]

> Hess responds that
>
>> Schlumberger paints with broad strokes, ignoring the four separate and distinct subcategories of methanol-contamination damages: (1) lost profits from selling the methanol-contaminated oil at a markdown, (2) costs incurred transporting and blending the methanol-contaminated oil, (3) costs incurred storing and treating the methanol-contaminated oil, and (4) compensation paid to other producers for contaminating their clean production during the commingling process. Much like the Gunflint Damages, the first subcategory claims lost profits relating to a non-conforming good, not "damage to or loss" of Hess's property. . . . The second and third subcategories similarly seek lost profits — that is, Hess's "loss of net income" spent to make the methanol-contaminated oil marketable. . . . The fourth subcategory alleges damages to third parties, not to Hess. Accordingly, Hess has not released Schlumberger for these damages.[87]

Hess does not dispute that it injected the methanol into the wells that contaminated the oil, or that it owned the oil that was contaminated. Because the indemnity provision applies to "damage to or loss of property of company . . . whether real or personal (including, without limitation . . . subsurface reservoirs and any oil and gas or other hydrocarbon substances located therein)," the

---

[86]STC's MSJ, p. 16, Docket Entry No. 116, p. 22 (citing Pulliam Report, p. 10 ¶ 32, Exhibit 7 to Schlumberger's MSJ, Docket Entry No. 116-7, p. 13 ¶ 32 ("Hess injected methanol into the TBells wells to attempt to re-open the SCSSVs after they failed and then also to prevent the formation of hydrates in the deepwater wells during the workovers to retrieve and replace the SCSSVs. In sufficient quantities, methanol is considered a harmful contaminant and must be removed from the crude oil stream before it is processed in a refinery.").

[87]Hess's Response in Opposition to STC's MSJ, p. 13, Docket Entry No. 127, p. 21.

court concludes that Schlumberger is entitled to summary judgment on Hess's claims for costs incurred due to methanol contaminated oil in its wells because those costs seek relief for damage to or loss of Hess's property.

3. <u>Whether Schlumberger Breached the Contract Presents Fact Issues for Trial</u>

Asserting that "[t]he contract prescribes processes, not product specifications,"[88] and that Hess alleges "the [SSVs] violated three principal sections of API 14A,"[89] Schlumberger argues that "Hess misreads those sections,"[90] and that "[u]nder properly construed API standards, there was no breach here."[91] Hess responds that "the evidence shows the opposite,"[92] and that the Twelfth, not the Eleventh, Edition of API 14A applies to the Well B(2) valve.[93] Hess alleges that

> [t]he Schlumberger Safety Valves themselves did not conform to the agreed specifications and standards under the Contract. Moreover, Schlumberger's process to manufacture and test the valves did not conform to the

---

[88]STC's MSJ, p. 16, Docket Entry No. 116, p. 22.

[89]<u>Id.</u> at 17, Docket Entry No. 116, p. 23 (citing TAC pp. 23-25 ¶¶ 73, 74, and 77).

[90]<u>Id.</u>

[91]<u>Id.</u> at 20, Docket Entry No. 116, p. 26. <u>See also</u> STC's Reply in Support of MSJ, pp. 8-15, Docket Entry No. 144, pp. 15-22.

[92]Hess's Response in Opposition to STC's MSJ, Docket Entry No. 127, p. 23.

[93]<u>Id.</u> at 26.

processes Schlumberger was contractually required to follow.[94]

Although Hess alleges that "[t]he non-conformity of the Schlumberger Safety Valves includes, but is not limited to" at least ten different requirements,[95] Schlumberger seeks summary judgment on only three of the alleged requirements.

> (a)  Whether Schlumberger Breached API 14A § 6.3.2.2 is a Fact Issue for Trial

Hess alleges:

> API 14A Section 6.3.2.2 provides that "SSSV equipment conforming to this International Standard shall be manufactured to drawings and specifications that are substantially the same as **those** of the size, type, and model SSSV equipment that has passed the validation test." Exhibit 1, Tab 5, at page 11. . . . Schlumberger has admitted that the Schlumberger Safety Valves were not manufactured to drawings and specifications that were substantially the same as those of the size, type, and model safety valve equipment that had passed a validation test. Exhibit 3, at pages 28-29. Certain component parts of the Schlumberger Safety Valves were instead manufactured to incorrect dimensions that did not meet the required specifications for Schlumberger's safety valves that had passed validation tests. Because component parts of the MSE seals in the Schlumberger Safety Valves did not meet a required geometric seal design that had been qualified and validated in accordance with API 14A, Schlumberger has admitted that the MSE seals and Schlumberger Safety Valves delivered to Hess were never validated, qualified, or properly certified in accordance with API 14A. Exhibit 4; Exhibit 5. The Schlumberger Safety Valves did not conform to API 14A Section[] 6.3.2.2 . . . Schlumberger

---

[94]TAC, Docket Entry No. 71, p. 21 § 66.

[95]Id. at 22-27 ¶¶ 68-80.

was contractually obligated to provide an API 14A-compliant valve and failed to do so.[96]

Asserting that "[a] manufacturer complies with Section 6.3.2.2 when its SSV equipment is 'manufactured to drawings and specifications that are substantially the same as *those [i.e., the drawings and specifications]* of the . . . model SSV equipment,"[97] and citing the Rebuttal Expert Report of David E. McCalvin, Schlumberger argues that "[t]here is no genuine dispute that the 'drawings and specifications' used to manufacture the safety valves sold to Hess were 'substantially the same' as the drawings and specifications of the validated valves."[98]

Hess counters that the word "those" used in § 6.3.2.2 refers not to drawings and specifications but, instead, to validated safety valve equipment. In other words, Hess argues that § 6.3.2.2 requires the SSVs manufactured and sold to it by Schlumberger to be substantially the same as the validated valves.[99] As evidence that the SSVs at issue were not substantially the same as the validated

---

[96]TAC, Docket Entry No. 71, pp. 23-24, ¶ 73 (quoting Specification for Subsurface Safety Valve Equipment, ANSI/API Specification 14A, Eleventh Edition, p. 11 § 6.3.2.2, Exhibit 1-Tab 5 to Plaintiff's Second Amended Complaint, Docket Entry No. 26-5, p. 20).

[97]STC's MSJ, p. 17, Docket Entry No. 116, p. 23.

[98]Id. (citing Exhibit 11 to STC's MSJ, Rebuttal Expert Report of David E. McCalvin ("McCalvin Rebuttal Report"), pp. 13, 32-33, 44, 177-78, 196-97, 219-21, Docket Entry No. 116-11, pp. 4-6, 10, 19-22, 24-26).

[99]Hess's Response in Opposition to STC's MSJ, pp. 15-16, Docket Entry No. 127, pp. 22-23.

valves, Hess cites the Safety Valve Test and Inspection Engineering

Report prepared by Schlumberger stating:

> The MSE Seal Spring is the primary root cause of the failure as the MSE Seal is from the suspect batch of MSE Seals.
>
> . . .
>
> It was found that the supplier was no longer providing the same qualified spring as to the 2004 MSE Seal Set qualification. The non-conformance in the spring altered the performance of the MSE and compromised the sealing capability of the seal stack.[100]

Alternatively, Hess argues that Schlumberger breached § 6.3.2.2

even under its own interpretation because Schlumberger lacked

drawings and specifications of the 2004 certified MSE seal until a

subcontractor, Greene Tweed, reverse engineered such drawings from

existing seals after the SSVs were installed in Wells B, C, and

D.[101]   In support of this argument Hess cites the deposition

testimony of Dwayne May that "[t]here was no assembly drawing, no

dimensional assembly drawing other than the parts themselves,"[102]

---

[100]Exhibit 13 to Hess's Response in Opposition to STC's MSJ, Safety Valve Test and Inspection Engineering Report, p. 28 of 55, Docket Entry No. 127-14, p. 3.

[101]Hess's Response in Opposition to STC's MSJ, p. 16, Docket Entry No. 127, p. 24 (citing Exhibit 18, Oral and Videotaped Deposition of Dwayne May ("May Deposition"), p. 239:10-23, Docket Entry No. 127-19, p. 4). See also Exhibit 13, Safety Valve Test, p. 30 of 55, Docket Entry No. 127-14, p. 5 ("No dimensional inspection drawing was initially included in the SLB part record. The inspection requirements were found to be sub-standard. Dimensional inspection prints were developed by Greene Tweed and are now included in all part records to ensure all critical dimensions are met.").

[102]Id. (citing Exhibit 18 to Hess's Response in Opposition to STC's MSJ, May Deposition, p. 238:14-21, Docket Entry No. 127-19, p. 3).

and the deposition testimony of Schlumberger's API expert, David McCalvin, that safety equipment could not be manufactured in compliance with the API standard if there were no drawings and specifications.[103]

Regardless of whether the word "those" used in § 6.3.2.2 refers to drawings and specifications as Schlumberger argues, or to safety valve equipment as Hess argues, Hess's evidence that the SSVs at issue were not substantially the same as validated seals, and were manufactured before Greene Tweed reverse engineered drawings and specifications, persuade the court that whether Schlumberger breached § 6.3.2.2 of the API 14A requirements is a genuine issue of material fact for trial.

> (b) Whether Schlumberger Breached API 14A § 7.6.2 is a Fact Issue for Trial

Hess alleges:

API 14A Section 7.6.2 provides that components such as MSE seals "shall be dimensionally inspected to assure proper function and compliance with design criteria and specifications." Exhibit 1, Tab 5, at page 18. Schlumberger failed to dimensionally inspect the MSE seals to assure proper function and compliance with design criteria and specifications. Schlumberger has admitted that no dimensional inspection was performed on the MSE seals in the Schlumberger Safety Valves. Exhibit 4; Exhibit 5. The Schlumberger Safety Valves did not conform to API 14A Section 7.6.2. Schlumberger was

---

[103]Id. (citing Exhibit 34 to Hess's Response in Opposition to STC's MSJ, Oral Deposition of David E. McCalvin ("McCalvin Deposition"), pp. 54:8-55:5, Docket Entry No. 127-35, pp. 3-4).

contractually obligated to provide an API 14A-compliant valve and failed to do so.[104]

Asserting that § 7.6.2 states that "[a]ll traceable components, *except non-metallic seals*, shall be dimensionally inspected to assure proper function and compliance with design criteria and specifications," Schlumberger argues that this section does not apply to the SSVs because "'the seal is created by using a non-metallic substance.'"[105] Acknowledging that seals may contain metal components such as springs,[106] Schlumberger argues that it is entitled to summary judgment that it did not breach § 7.6.2 because "the seals here have a non-metallic surface, 'the entire seal assembly,' including any components, 'is considered part of the non-metallic seal.' . . . Thus, Section 7.6.2 'does not require Schlumberger to perform dimensional inspections' of the seals."[107] In support of this argument, Schlumberger cites the McCalvin Rebuttal Report,[108] stating in pertinent part:

---

[104]TAC, Docket Entry No. 71, p. 25 ¶ 77 (quoting Specification for Subsurface Safety Valve Equipment, ANSI/API Specification 14A, Eleventh Edition, p. 18, § 7.6.2, Exhibit 1-Tab 5 to Plaintiff's Second Amended Complaint, Docket Entry No. 26-5, p. 27).

[105]STC's MSJ, p. 19, Docket Entry No. 116, p. 25 (citing Exhibit 11 to STC's MSJ, McCalvin Rebuttal Report, pp. 165-67, 208, Docket Entry No. 116-11, pp. 11-13, 23; and Exhibit 15 to STC's MSJ, Oral Deposition of Dennis M. Read, Jr. ("Read Deposition"), p. 15:1-8, Docket Entry No. 116-15, p. 5.

[106]Id. (citing Exhibit 10, Schlumberger TRC-II 5-1/2" 15k SCSSV Failure Analysis Report Tubular Bells Wells D, B & C by David E. Hirth ("Hirth Report"), p. 4, Docket Entry No. 116-10, p. 3).

[107]Id. (quoting Exhibit 11 to STC's MSJ, McCalvin Rebuttal Report, pp. 166-67, Docket Entry No. 116-11, pp. 12-13).

[108]STC's Reply in Support of MSJ, pp. 12-13, Docket Entry No. 144, pp. 19-20.

MSE seal assemblies are considered non-metallic seals in the industry. This is because the sealing surfaces of the MSE seals themselves are non-metallic. The opposite of a non-metallic seal is a metallic seal, which would create a metal-to-metal seal. Notably, a MSE seal is not a metallic seal. The metal in the MSE seals is used to energize the sealing surface, not to create the seal. As a result, there is no requirement within API 14A, Eleventh Edition to dimensionally inspect every MSE seal assembly because they are non-metallic seals, and not subject to the requirements of Section 7.6.2. This has been the common understanding of the meaning of this section throughout the industry.[109]

Asserting that McCalvin testified at his deposition that the rosette spring "is not a sealing surface" and "could be considered a component of the MSE seal assembly,"[110] Hess argues in response that rosette springs are "traceable components" for which § 7.6.2 requires dimensional testing. Then, citing the Safety Valve Test that Schlumberger prepared for Hess, Hess argues that "Schlumberger . . . never dimensionally inspected the rosette spring component until September 2015 at the earliest (nor did Greene Tweed always do so, for that matter). It therefore breached § 7.6.2."[111]

---

[109]Exhibit 11 to STC's MSJ, McCalvin Rebuttal Report, pp. 34-35, Docket Entry No. 116-11, pp. 7-8. See also id. at 165-66, Docket Entry No. 116-11, pp. 11-12 ("If a seal is non-metallic, then it is not governed by the dimensional inspection requirement of [§] 7.6.2 of API 14A. As I have explained earlier in my report, the industry considers MSE seal assemblies of the type at issue here, where the sealing surface is non-metal and the non-metal sealing surface is merely energized by two metal springs, to be non-metallic seals.").

[110]Hess's Response in Opposition to STC's MSJ, p. 17, Docket Entry No. 127, pp. 25-26 (citing Exhibit 34 to STC's MSJ, McCalvin Deposition, pp. 64:5-8 and 106:8-11, Docket Entry No. 127-35, pp. 6 and 12).

[111]Id. at 17-18, Docket Entry No. 127, pp. 25-26 (citing Exhibit 13 to Hess's Response in Opposition to STC's MSJ, Safety Valve Test, p. 28 of 55, Docket Entry No. 127-14, p. 3).

-52-

Section 7.6.2 governing "[c]omponent dimensional inspection," states:

> All traceable components, except non-metallic seals, shall be dimensionally inspected to assure proper function and compliance with design criteria and specifications. Inspection shall be performed during or after the manufacture of the components but prior to assembly, unless assembly is required for proper measurement.[112]

While McCalvin testified that the SSVs are exempt from dimensional inspection under § 7.6.2 because they are non-metallic seals, Schlumberger has failed to cite evidence establishing as a matter of law that the component parts of the SSVs are not "traceable components" subject to the dimensional testing required by § 7.6.2. To the contrary Schlumberger has acknowledged that the SSVs have component parts that are metallic, i.e., seal springs, and the Safety Valve Test that Schlumberger prepared for Hess concluded that the seal springs were the "primary root cause" of the SSV failures, "the supplier was no longer providing the same qualified [seal] spring as to the 2004 MSE Seal Set qualification," and "[t]hese critical components now all require 100% dimensional inspection."[113] Because the seal springs are not non-metallic seals but, instead, component parts of non-metallic seals, whether the

---

[112]Specification for Subsurface Safety Valve Equipment, ANSI/API Specification 14A, Eleventh Edition, p. 18, § 7.6.2, Exhibit 1-Tab 5 to Plaintiff's Second Amended Complaint, Docket Entry No. 26-5, p. 27.

[113]Exhibit 13 to Hess's Response in Opposition to STC's MSJ, Safety Valve Test, p. 28 of 55, Docket Entry No. 127-14, p. 3.

seal springs are "traceable components" subject to § 7.6.2's dimensional inspection requirement and whether Schlumberger breached that requirement by failing to dimensionally inspect the seal springs are fact issues for trial.

> (c) Whether Schlumberger Breached API 14A § 7.6.3(c) is a Fact Issue for Trial

Hess alleges:

> API 14A Section 7.6.3(c) provides that "sealing elements shall meet dimensional tolerances of the manufacturer's written specifications." Exhibit 1, Tab 5, at page 18. Schlumberger has admitted that certain component parts of the MSE seals used in the Schlumberger Safety Valves did not meet dimensional tolerances of the manufacturer's written specifications. Exhibit 3, pages 28-29. The Schlumberger Safety Valves did not conform to API 14A Section 7.6.3(c). Schlumberger was contractually obligated to provide an API 14A-compliant valve and failed to do so.[114]

Schlumberger argues that it is entitled to summary judgment that it did not breach the requirements of § 7.6.3(c) "because it is the manufacturer, and it did not have written, specified dimensional tolerances for the seal components."[115] Citing § 3.14 of the API 14A, Eleventh Edition, Schlumberger argues that "manufacturer" means "principal agent in the design, fabrication and furnishing of equipment, who chooses to comply with this International Standard."[116] Citing the McCalvin Rebuttal Report Schlumberger argues that

---

[114]TAC, Docket Entry No. 71, p. 24 ¶ 74.

[115]STC's MSJ, p. 20, Docket Entry No. 116, p. 26.

[116]Id.

[a]s for "written specifications," Section 7.6.3 does not require the manufacturer — here, Schlumberger — to include dimensional tolerances in its specifications, particularly when its vendor, Greene Tweed, generated its own, internal written specifications with dimensions and dimensional tolerances for components of its proprietary design. Ex. 11 at 167-72. It is not unusual for a supplier such as Greene Tweed to keep its written specifications for its designs as trade secrets. *Id.* at 168. Moreover, measuring seal components would have required Schlumberger to disassemble, inspect, and reassemble the seals. *Id.* That would have damaged the seals, which are not designed to be disassembled. *Id.* at 46-47. Section 7.6.3 was not breached, either.[117]

Citing the McCalvin Deposition Hess argues that whether the manufacturer of the SSVs for purposes of complying with § 7.6.3(c) was Schlumberger or Greene Tweed is a fact issue for trial. In support of this argument Hess asserts McCalvin testified that the term "manufacturer" can refer to different entities depending on the context,[118] that when initially asked, "who is the manufacturer?," McCalvin answered "Greene Tweed,"[119] but that McCalvin subsequently changed his mind and identified Schlumberger as the "manufacturer" for purposes of § 7.6.3(c).[120] McCalvin's conflicting testimony shows that whether Schlumberger or Greene Tweed was the "manufacturer" and whether Schlumberger breached

---

[117]*Id.* (citing Exhibit 11 to STC's MSJ, McCalvin Rebuttal Report, pp. 167-72, Docket Entry No. 116-11, pp. 13-18).

[118]Hess's Response in Opposition to STC's MSJ, p. 18, Docket Entry No. 127, p. 26 (citing Exhibit 34 to Schlumberger's MSJ, McCalvin Deposition, p. 68:10-14, Docket Entry No. 127-35, p. 9).

[119]*Id.* (citing Exhibit 34 to STC's MSJ, McCalvin Deposition, p. 66:22-24, Docket Entry No. 127-35, p. 8).

[120]*Id.* & n.19 (citing Exhibit 34 to STC's MSJ, McCalvin Deposition, p. 119:12-19, Docket Entry No. 127-35, p. 13).

§ 7.6.3(c) by failing to provide Hess with SSVs whose sealing elements met dimensional tolerances of the manufacturer's written specifications are fact issues for trial.

> (d)  Hess Has Alleged Violations of the Eleventh Edition of API 14

Asserting that "Schlumberger agreed to provide safety valves conforming to 'the *latest edition* of' API 14A,"[121] Hess argues that

> Schlumberger retrofitted — that is, manufactured — the Well B2 safety valve in late January 2016 and delivered that valve to Hess in the spring of 2016. . . At that time, the Twelfth Edition was the "latest edition" of API 14A . . .; that's why Schlumberger and its clients applied the Twelfth Edition of API 14A to the retrofitted safety valves rather than the Eleventh Edition. . . Schlumberger itself identified compliance "gaps" with the Twelfth Edition of API 14A. . . Schlumberger's API expert agrees that the Well B2 safety valve does not conform to the Twelfth Edition of API 14A.[122]

In support of this argument Hess submits the title page of the Twelfth Edition of API 14A showing an effective date of January 15, 2016,[123] and a document titled TRC-II MSE Seal Qualified and Reproduction Bridging Document prepared by Schlumberger for another client, i.e., BP, that contains a "Gap Analysis" for API 14A Twelfth Edition requirements.[124]

---

[121]*Id.* at 18-19, Docket Entry No. 127, pp. 26-27.

[122]*Id.* at 19, Docket Entry No. 127, p. 27.

[123]*Id.* (citing Exhibit 24 to Hess Response in Opposition to STC's MSJ, Docket Entry No. 127-25).

[124]*Id.* (citing Exhibit 41 to Hess Response in Opposition to STC's MSJ, Docket Entry No. 127-42, pp. 16-17).

Schlumberger responds that the Twelfth Edition does not apply to Hess's claims because the Well B(2) valve work was a repair,[125] § 7.1 of the Twelfth Edition provides that "[r]epair operations for SSSVs . . . shall include the return of the product to a condition meeting all requirements stated in this specification or the edition of this specification in effect at the time of original manufacture,"[126] and the Certificate and Shipping Report for the Well B(2) valve stating that it was certified to the Eleventh Edition of API 14A.[127]

Hess filed it's TAC on May 9, 2018, alleging, inter alia, "[d]espite Schlumberger's contractual obligations and assurances, the Schlumberger Safety Valves were not manufactured and tested in accordance with the Eleventh Edition of API 14A, which was the latest edition of API 14A published at the time the Commercial Agreement was entered."[128] Hess's TAC does not allege any specific violations of the API 14A Twelfth Edition. Moreover, the Certificate and Shipping Report for the Well B(2) valve clearly states that it was certified to the Eleventh Edition of API 14A.[129]

---

[125]STC's Reply in Support of MSJ, Docket Entry No. 144, pp. 21-22.

[126]Id. (citing Exhibit 31 to STC's Reply in Support of MSJ, Docket Entry No. 144-7, p. 58).

[127]Id. at 21 (citing Exhibit 32 to STC's Reply in Support of MSJ, Docket Entry No. 144-9).

[128]TAC, Docket Entry No. 71, p. 23 ¶ 71.

[129]Exhibit 32 to STC's Reply in Support of MSJ, Docket Entry No. 144-9.

The court concludes therefore that the Eleventh Edition of API 14A applies to the claims that Hess has asserted in this action.

## B. Schlumberger is Not Entitled to Summary Judgment on Hess's Breach of Contract Claim for the Well B(2) Valve

Schlumberger argues that it is entitled to summary judgment on Hess's claims as to the Well B(2) valve pursuant to the January 1, 2017, Bridging Agreement because "the Well B(2) valve claims are not 'Disputed Claims'" thereunder.[130] Schlumberger argues that "[e]ven if the Well B(2) valve claims somehow survived, Hess's damages on the claims are capped" at "one hundred fifty percent (150%) of the invoiced amount." Hess argues in response that its Well B(2) valve claims are neither waived nor limited by the Bridging Agreement.[131]

The Bridging Agreement is an "amendment to the [MSC],"[132] which in pertinent part provides:

> a. Except for the performance by either Party under the Contract related to the Disputed Claims as defined below, Section 13 of the [MSC] is hereby amended for contracts between the Parties entered into before, on or after the Bridging Agreement Effective Date by adding the following new Section 13(k): . . .

> The term "Disputed Claims" means any and all claims whether asserted or unasserted, known or unknown, related

---

[130]STC's MSJ, p. 21, Docket Entry No. 116, p. 27.

[131]Hess's Response in Opposition to STC's MSJ, p. 19, Docket Entry No. 127, p. 27.

[132]Exhibit 4 to STC's MSJ, Bridging Agreement, p. 1, Docket Entry No. 116-4, p. 2.

to or arising out of (a) the facts as described in the complaint filed by [Hess] on November 18, 2016 (Case 4:16-cv-03415) against [Schlumberger] in the United States District Court for the Southern District of Texas, Houston Division, or (b) the performance expectations of the replacement Surface Controlled Subsurface Safety Valves ("SCSSV" or "Valves") for Wells B and D, as well as the original Valve for Well A at the Tubular Bells Lease.[133]

### 1. Well B(2) Claim is a "Disputed Claim" under Clause (a) of the Bridging Agreement

Schlumberger argues that it is entitled to summary judgment on Hess's Well B(2) claim under clause (a) of the Disputed Claims provision because the Well B(2) claim is not "related to," and does not "aris[e] out of," "the facts described in the complaint filed by [Hess] on November 18, 2016."[134] Schlumberger argues that the complaint filed on November 18, 2016 (Docket Entry No. 1),

> never mentions the Well B(2) valve, except to say that it was replaced by a valve with "components qualified and verified as per design." ECF No. 1 at ¶ 34. Hess added no claims concerning Well B(2) until its [TAC]. *See* ECF No. 71 at ¶¶ 53-56. Those claims are not covered by section (a).[135]

Hess responds that its

> original complaint alleged revocation of acceptance based on Schlumberger's delivery of non-conforming safety valves containing non-conforming MSE seals that caused their ultimate failure. ECF No. 1, at 8-10. Hess's Well B(2) claim alleges the same. ECF No. 71, at 29-31. Were that not enough, Hess's Well B(2) claim flows directly from allegations in Hess's original complaint: had the

---

[133]Id.

[134]STC's MSJ, p. 21, Docket Entry No. 116, p. 27.

[135]Id.

Well B safety valve not failed, Hess would not have been forced to install the Well B(2) safety valve. Indeed, Schlumberger already implicitly acknowledged this close relationship when the parties jointly requested to extend the scheduling order, suggesting that amending Hess's complaint to include Well B(2) would "save the time and resources of the parties and the Court." ECF No. 67, at 1. Because the Well B(2) claim has some nexus to facts described in the November 2016 complaint, it "relate[s] to or aris[es] out of" those facts. Exh. 30, at 1.[136]

The court is not persuaded by Schlumberger's argument that Hess's Well B(2) claim is not covered by the Disputed Claims provision because Hess "added no claims concerning Well B(2) until its third amended complaint."[137] The Disputed Claims provision expressly states that "[t]he term 'Disputed Claims' means any and all claims whether asserted or unasserted, known or unknown."[138] Schlumberger's argument that the Disputed Claims provision only applies to asserted, known claims violates the accepted rule of contract construction that the court must examine the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. See Coker, 650 S.W.2d at 393. Schlumberger's argument that the Well B(2) claim falls outside the Disputed Claims provision because it does not "relate to," or "aris[e] out of,"

_____

[136]Hess Response in Opposition to STC's MSJ, p. 21, Docket Entry No. 127, p. 29.

[137]STC's MSJ, p. 21, Docket Entry No. 116, p. 27.

[138]Exhibit 4 to STC's MSJ, Bridging Agreement, p. 1, Docket Entry No. 116-4, p. 2.

"the facts described in the complaint filed by [Hess] on November 18, 2016,"[139] lacks merit because those broad phrases require only a "causal connection or relation" to the facts alleged in the November 18, 2016, complaint. See Crimson Exploration, Inc. v. Intermarket Management, LLC, 341 S.W.3d 432, 443 (Tex. App. — Houston [1st Dist.] 2010, no pet.) (citing E.I. Du Pont De Nemours and Co. v. Shell Oil Co., 259 S.W.3d 800, 806 (Tex. App. — Houston [1st Dist.] 2007, pet. denied)).

Because Hess alleges that the Well B(2) claim involves the same non-conforming MSE seal (albeit with slightly different dimensions) as the claims asserted in the November 18, 2016, complaint, the court concludes that Hess's Well B(2) Claim is a "Disputed Claim" under Clause (a) of the Bridging Agreement's Disputed Claims provision, and therefore that Hess's damages on the claim are not subject to the caps otherwise imposed by the Bridging Agreement's amendments to the MSC. Accordingly, the court concludes that Schlumberger is not entitled to summary judgment on Hess's Well B(2) claim because that claim is "related to" or "aris[es] out of" the facts described in Hess's November 18, 2016, complaint.

2. Well B(2) Claim is Not a "Disputed Claim" Pursuant to Clause (b) of the Bridging Agreement

Asserting that "the parties defined 'Disputed Claims' to cover 'the *performance expectations* of the replacement [valves] . . . for

---

[139]Schlumberger's MSJ, p. 21, Docket Entry No. 116, p. 27.

Wells B and D,'"[140] Schlumberger argues that it is entitled to summary judgment on Hess's Well B(2) claim pursuant to clause (b) of the Disputed Claims provision because the court's June 29, 2017, Memorandum Opinion and Order dismissed all of Hess's performance-expectation claims.[141] Hess's Response in Opposition to STC's MSJ on its Well B(2) claim does not mention clause (b)'s reference to "the performance expectations of the replacement [valves]," and is instead based on language from clause (a) of the Bridging Agreement's "Disputed Claims" provision. The court concludes that any Well B(2) claim that Hess has asserted or attempted to assert based on performance expectations of the replacement valve is precluded by the holding in the court's June 29, 2017, Memorandum Opinion and Order that "Hess may not proceed with its claims based on the failure of the [valves] to function after the warranty period." Hess, 2017 WL 2829697, at *7.

## C. Schlumberger is Not Entitled to Summary Judgment Because Hess Has Failed to Satisfy the Appropriate Standard to Recover Incidental Damages

Recognizing that under the Texas Business and Commerce Code a buyer may recover incidental damages "resulting from" a seller's breach of contract, Schlumberger asserts that Hess must satisfy a

---

[140]STC's MSJ, p. 21, Docket Entry No. 116, p. 27 (citing Exhibit 4 to Schlumberger's MSJ, Bridging Agreement, p. 1, Docket Entry No. 116-4, p. 2).

[141]STC's MSJ, p. 21, Docket Entry No. 116, p. 27 (citing Memorandum Opinion and Order, Docket Entry No. 40, p. 16. See also Hess, 2017 WL 2829697, at *7).

but-for standard to recover incidental damages, and argues that Hess has failed to provide evidence using that measure of damages.[142] Citing Delhomme, 735 F.2d at 185-86, Schlumberger argues that it is entitled to summary judgment on workover costs and lost-opportunity costs because a majority of the costs Hess seeks, about $177 million, stem from workovers performed by the *Stena Forth* drillship, which Hess had under contract and would have paid even if the SSVs had not failed.[143] Citing Eni US Operating Co., Inc. v. Transocean Offshore Deepwater Drilling, Inc., 919 F.3d 931, 941 (5th Cir. 2019), Schlumberger argues that

> Hess cannot recover these costs, which it would have incurred in a "non-breach world." . . . Instead, Hess should have attempted to quantify how much it lost by using the *Stena Forth* to perform workovers instead of drilling new wells. Hess did not do so. As a result, its claims for Well B, C, and D workover costs should be dismissed.[144]

Asserting that it is not seeking lost-opportunity costs, Hess responds that "[m]ost incidental damages do not require some overly complex (and almost certainly speculative) cash inflow and outflow projection; rather, the buyer simply must set forth some evidence showing that the claimed damages, in whatever form they take, would not have been incurred absent the non-conformity."[145] Citing

---

[142]STC's MSJ, pp. 22-25, Docket Entry No. 116, pp. 28-31.

[143]Id. at 22, Docket Entry No. 116, p. 28.

[144]Id.

[145]Hess Response in Opposition to STC's MSJ, p. 22, Docket Entry No. 127, p. 30.

_Leggett & Platt, Inc. v. Yankee Candle Co.,_ Civil Action No. 4:06-CV-366-Y, 2008 WL 723582, at \*1-2 (N.D. Tex. March 18, 2008), Hess argues that incidental damages are available when the seller's breach forces the buyer to divert resources it allocated from one task to another resulting in additional costs.

In _Leggett & Platt_ a buyer purchased and installed hundreds of shelves that failed to conform to its contract with the seller. Although the seller provided replacement shelves at no cost, the buyer sought to recover as incidental damages the additional expense and "work-hours to have its employees replace the shelves in all of its stores." _Id._ at \*11. The seller argued that those damages were not caused by its breach because the buyer would have to pay its employees for their duties regardless of the replacement of the defective shelves. The court rejected the seller's argument stating, "[i]t's irrelevant that [the buyer] would be paying its employees regardless, what's relevant is that instead of performing their regular duties, they now have to reinstall new shelving because of [the] breach. That is a cognizable harm." _Id._

Texas Business and Commerce Code § 2.715(a) entitles aggrieved buyers who properly revoke acceptance to recover

> [i]ncidental damages resulting from the seller's breach includ[ing] expenses reasonably incurred in inspection, receipt, transportation and care and custody of goods rightfully rejected, any commercially reasonable charges, expenses or commissions in connection with effecting cover and any other reasonable expense incident to the delay or other breach.

-64-

Although the Texas Business and Commerce Code does not define the term "resulting from," neither party disputes that in this context the term means "because." Indeed, both parties cite <u>Carbontek Trading Co., Ltd. v. Phibro Energy, Inc.</u>, 910 F.2d 302, 308 (5th Cir. 1990), for its conclusion that incidental damages are available when the buyer incurred them because the product was non-conforming. <u>Id.</u> ("Phibro incurred the enumerated expenses only because Carbontek's coal was nonconforming."). <u>See also Indust-Ri-Chem Laboratory, Inc. v. Par-Pak Company, Inc.</u>, 602 S.W.2d 282, 291 n.2 (Tex. App. — Dallas 1980, no writ) ("The term 'caused' is used here rather than 'proximately caused' because we are not sure that 'proximately caused' is the appropriate standard."). Accordingly, the court concludes that the proper standard for analyzing Hess's claim for incidental damages for removing and replacing the SSVs is that stated in <u>Carbonteck,</u> i.e., whether those damages were incurred because Schlumberger's SSVs were non-conforming.

The court is not persuaded that either <u>Delhomme,</u> 735 F.2d at 185-86, or <u>Eni,</u> 919 F.3d at 941, prohibits recovery of the incidental damages that Hess seeks for retrieving and replacing the non-conforming SSVs. <u>Eni</u> is inapposite because, unlike the present case, it involved a common law breach of contract claim arising from a contract for services in which the court held that the non-breaching party was entitled to expectation damages that were not properly calculated. <u>Delhomme</u> is inapposite because, unlike the present case, it involved a breach of warranty action in which the

court noted that the buyer of an aircraft would have incurred the insurance and finance charges even if the aircraft had been as warranted. The insurance and finance payments in Delhomme were held to be incident to the buyer's owning, maintaining, and using the aircraft and not to the seller's breach. The facts in the present case are distinguishable from the facts in Delhomme because the costs Hess incurred employing the *Stena Forth* drillship were not incident to Hess's owning, maintaining, or using the SSVs; and if the SSVs had been conforming, Hess would not have had to pay the *Stena Forth* drillship to remove and replace them.

The facts of the present case are analogous to the facts in Leggett & Platt, 2008 WL 723582, where the court rejected the breaching seller's argument that the buyer should not be able to recover as incidental damages the work-hours to have its employees replace the shelves in all of its stores because the buyer would be paying its employee's anyway. Id. at *11. The court concludes that it is irrelevant that Hess would be paying for the *Stena Forth* regardless of Schlumberger's breach; what is relevant is that instead of paying the *Stena Forth* to drill new wells, Hess had to pay the *Stena Forth* to remove and replace the non-conforming SSVs. That is a cognizable harm. Accordingly, the court concludes that Schlumberger is not entitled to summary judgment on Hess's claims for workover costs, i.e., costs incurred to retrieve and replace the non-conforming SSVs.

## VI. Hess's Motion for Partial Summary Judgment

Schlumberger asserts multiple affirmative defenses, including the affirmative defense of release, by alleging:

> Hess's claims are barred by release. The [MSC] released [Schlumberger] from all claims brought by any party for any and all "damage to or loss of property". Master Service Contract No. 7525 . . . Art. 13(c)(1).[146]

Citing the indemnity provision in Article 13 of the MSC, Schlumberger asserts a single counterclaim for indemnity alleging:

> 8. On November 18, 2016 Hess filed this action in the United States District Court for the Southern District of Texas asserting a claim against Schlumberger for breach of contract.
>
> 9. Hess's lawsuit asserts claims for damage to and loss of Hess's property, including subsurface safety valves provided by [Schlumberger] to Hess.
>
> 10. Hess's lawsuit asserts claims on account of loss of or damage to [Schlumberger's] property, equipment, materials, or products, including subsurface safety valves provided by [Schlumberger] to Hess.
>
> 11. By filing a lawsuit, Hess has breached its obligation to defend and hold harmless [Schlumberger] against these claims.
>
> 12. Hess's indemnity obligations require Hess to indemnify [Schlumberger] for the attorney's fees already incurred in defending against the claims asserted by Hess.
>
> 13. In the event that Hess receives a judgment against [Schlumberger], Hess's indemnity obligations would require Hess to indemnify [Schlumberger] for the amount of any judgment awarded to Hess.[147]

------

[146]Defendants' Answer and Affirmative Defenses and Counter-claims to Hess's Third Amended Complaint, Docket Entry No. 72, p. 19 (Sixth Affirmative Defense).

[147]Id. at 21 ¶¶ 8-13.

Hess argues that it is entitled to summary judgment on Schlumberger's affirmative defense of release and counterclaim for indemnity because "(I) Hess's claims do not seek recovery for 'damage to or loss' of Hess's property and (II) more broadly, the MSA's indemnity-and-release provisions do not apply to a breach of contract under the Commercial Agreement."[148] Schlumberger responds that "[e]very category of damage described by Hess is property damage, meaning all of its claims were released in the knock-for-knock provision,"[149] and that "[b]y covering all claims for property damage arising out of Schlumberger's 'work,' the knock-for-knock provision covers breach-of-contract claims."[150]

Hess's motion for summary judgment on Schlumberger's affirmative defense of release and counterclaim for indemnity depends on § 13 of the MSC ("Indemnity Provision"). "The interpretation of a contractual indemnity provision is a question of law . . ." Becker v. Tidewater, Inc., 586 F.3d 358, 369 (5th Cir. 2009). In pertinent part the Indemnity Provision states:

13. INDEMNITIES

(a) Definitions

. . .

3. "CLAIMS" shall include all claims, demands, suits, causes of action, losses,

---

[148]Hess's MPSJ, Docket Entry No. 118, p. 15.

[149]Defendant Schlumberger Technology Corporation's Opposition to Hess Corporation's Motion for Partial Summary Judgment ("STC's Opposition to Hess's MPSJ"), p. 6, Docket Entry No. 136, p. 11.

[150]Id. at 13, Docket Entry No. 136, p. 18.

liabilities, damages (including, without limitation, compensatory, and exemplary), judgments, awards, obligations to defend or indemnify others, and other costs of every kind and character (including, without limitation, court costs, attorneys' fees, debts and interest), known or unknown, whether the underlying claim, demand, or suit is groundless, false or fraudulent.

. . .

(b) IT IS THE SPECIFIC AND EXPRESSED INTENT AND AGREEMENT OF THE COMPANY AND THE CONTRACTOR THAT ALL RELEASE, DEFENSE, HOLD HARMLESS AND INDEMNITY OBLIGATIONS AND OTHER LIABILITIES ASSUMED BY COMPANY AND CONTRACTOR RESPECTIVELY UNDER SECTIONS 13(c) AND (d) SHALL BE WITHOUT REGARD TO THE NEGLIGENCE (WHETHER SOLE, JOINT, OR CONCURRENT, ACTIVE OR PASSIVE), BREACH OF WARRANTY, STRICT LIABILITY, PREMISES LIABILITY, DEFECTIVE CONDITION (WHETHER PRE-EXISTING OR OTHERWISE) OF ANY FACILITIES, EQUIPMENT, MATERIALS, TOOLS, OR OTHER ITEM WHATSOEVER . . . OR ANY OTHER FAULT OF THE INDEMNIFIED PARTIES OR ANY OTHER PARTY EXCEPTING ONLY THE GROSS NEGLIGENCE, RECKLESSNESS OR WILLFUL MISCONDUCT OF COMPANY GROUP OR CONTRACTOR GROUP.

(c) Company's Indemnity Obligations:

1. COMPANY SHALL FULLY RELEASE, DEFEND, INDEMNIFY AND HOLD CONTRACTOR GROUP HARMLESS FROM AND AGAINST ALL CLAIMS BROUGHT BY OR ON BEHALF OF ANY PARTY OR PERSON, FOR ANY AND ALL:

    (i) PERSONAL INJURY OF COMPANY AND ITS EMPLOYEES;

    (ii) WORKMEN'S COMPENSATION CLAIMS UNDER THE STATUTORY EMPLOYER DOCTRINE; AND

    (iii) DAMAGE TO OR LOSS OF PROPERTY OF COMPANY AND ITS EMPLOYEES, WHETHER REAL OR PERSONAL (INCLUDING, WITHOUT LIMITATION, PRODUCTION AND

-69-

> DRILLING EQUIPMENT, WELLBORE,
> CASING, SUBSURFACE RESERVOIRS AND
> ANY OIL AND GAS OR OTHER HYDRO-
> CARBON SUBSTANCES LOCATED THEREIN)
> WHENEVER AND WHEREVER OCCURRING,
> ARISING DIRECTLY OR INDIRECTLY OUT
> OF OR IN ANY WAY INVOLVING
> CONTRACTOR'S WORK . . . EQUIPMENT,
> TOOLS, MATERIALS, AND OTHER ITEMS
> WHATSOEVER FURNISHED, DELIVERED,
> STORED, OR OTHERWISE HANDLED BY
> CONTRACTOR . . . WITHOUT LIMIT AND
> REGARDLESS OF CAUSE OR FAULT, AS
> PARTICULARLY DESCRIBED IN SECTION
> 13(b) ABOVE.[151]

## A. The MSC's Indemnity-and-Release Provisions Encompass Hess's Breach of Contract Claims

Hess argues that it is entitled to summary judgment on Schlumberger's affirmative defense of release and counterclaim for indemnity because "by its terms, the MS[C]'s indemnity-and-release provisions do not apply to breach-of-contract claims and certainly do not apply to claims between the parties alleging breach of the *precise* agreement incorporating those provisions."[152] Citing Corbitt v. Diamond M. Drilling Co., 654 F.2d 329, 333-34 (5th Cir. 1981), and Sumrall v. Ensco Offshore Co., 291 F.3d 316, 318-20 & n.4 (5th Cir. 2002) (per curiam), Hess argues that indemnity provisions like the one at issue here that do not specifically indemnify for contractual liability do not apply to claims for breach of contract. Citing Mobil Chemical Co. v. Blount Brothers Corp., 809 F.2d 1175 (5th Cir. 1987), and quoting CompuCom Systems,

---

[151]MSC, § 13, Docket Entry No. 25-3, pp. 6-8.

[152]Hess's MPSJ, p. 15, Docket Entry No. 118, p. 22.

<u>Inc. v. WJ Global, LLC,</u> Civil Action No. 3:14-CV-3625-L, 2017 WL 1190492, at *5 (N.D. Tex. March 31, 2017), Hess argues that interpretation of the MSC's indemnity provision to apply to Schlumberger's own breach of the underlying contract

> "would lead to the absurd result whereby [Schlumberger] could materially breach the [Commercial Agreement] with impunity" by, for instance, delivering SCSSVs riddled with holes such that the valves could never be held open to allow for production, but still be entitled to indemnity or release from Hess.[153]

Schlumberger responds that "[b]y covering all claims for property damage arising out of Schlumberger's 'work,' the knock-for-knock provision covers breach-of-contract claims,"[154] and that "the Fifth Circuit has repeatedly distinguished <u>Corbitt</u> and held that indemnity provisions cover breach-of-contract claims even where such claims are not expressly included."[155] Asserting that the MSC not only provided Hess "a menu of remedies" in the event that Schlumberger breached its promises, but also "excludes willful misconduct," Schlumberger argues that it could not "materially breach the [Commercial Agreement] with impunity."[156]

Citing <u>Corbitt,</u> 654 F.2d at 329, and <u>Sumrall,</u> 291 F.3d at 316, Hess argues that interpreting the language of the Indemnity

---

[153]<u>Id.</u> at 18, Docket Entry No. 118, p. 25.

[154]STC's Opposition to Hess's MPSJ, p. 13, Docket Entry No. 136, p. 18.

[155]<u>Id.</u> at 14, Docket Entry No. 136, p. 19.

[156]<u>Id.</u> at 15, Docket Entry No. 136, p. 20.

Provision to cover claims for breach of contract would conflict with Fifth Circuit precedent indicating that a broad indemnity clause covering "all claims" does not include contractual obligations. In Corbitt the Fifth Circuit held that contractual language creating an indemnity obligation "for injury to or death or illness of persons" gave express notice only of claims based on tortious injuries but not contractual claims. Corbitt, 654 F.2d at 333-34. Shell Oil contracted with Diamond M. and Sladco to work on a drilling operation. Id. at 331. Corbitt, an employee of Sladco, sued Diamond M. in tort. Diamond M. then sought indemnification from Shell pursuant to their contract. Id. Shell subsequently filed a third-party action seeking indemnification from Sladco pursuant to their contract, which provided that "[Sladco] shall indemnify and defend [Shell] . . . against all claims, suits, liabilities and expenses on account of injury or death of . . . employees of Shell or [Sladco] . . . arising out of or in connection with performance of this [contract]." Id. The Fifth Circuit held that Shell was not entitled to indemnification from its contractor, Sladco, because the indemnification provision in the Shell/Sladco contract restricted Sladco's duty to indemnify solely to tortious obligations. Id. at 333. The Fifth Circuit refused to read the phrase "all claims" to include contractual obligations because the Shell/Sladco contract did not specifically provide that Sladco assumed claims arising from Shell's own separate contractual obligations. Id.

In contrast, the Fifth Circuit in <u>Sumrall</u> held that an indemnitor had notice of contractual liabilities where a contract provided indemnity "from and against all claims, losses, costs, demands, damages, suits, . . . and causes of action of whatsoever nature or character . . . and whether arising out of contract, tort, strict liability, . . . and/or any cause whatsoever." 291 F.3d at 318-19 n.4. The Fifth Circuit reasoned that, unlike the narrowly drawn language in <u>Corbitt,</u> the indemnity provisions in the contract at issue contained expansive language that broadened the indemnitor's right to indemnification for "all claims . . . of whatsoever nature or character . . . whether or not caused by the . . . legal duty of [Santa Fe]." <u>Id.</u> The Court also stressed that the contract specifically provided indemnity against liability arising out of the contract. <u>Id.</u> Although Hess argues that the MSC's Indemnity Provision is comparable to the indemnity provision at issue in <u>Corbitt</u> and not comparable to the indemnity provision at issue in <u>Sumrall</u> because it does not expressly provide for indemnity against liability arising out of contract, the court concludes that the Indemnity Provision and facts at issue in this case are distinguishable from those at issue in <u>Corbitt</u> and comparable to those at issue in <u>Sumrall.</u>

In <u>Corbitt</u> the Fifth Circuit stated that "[t]he contract need not contain any special words to evince an intention to create a right of indemnity for independent contractual liabilities."

Corbitt, 654 F.2d at 334. Instead, the contract need only "clearly

express such a purpose." Id. As in Corbitt the MSC's Indemnity

Provision does not contain the words "breach of contract," but as

in Sumrall it defines the term "claims" broadly by stating:

> "CLAIMS" shall include all claims, demands, suits, causes
> of action, losses, liabilities, damages (including,
> without limitation, compensatory, and exemplary),
> judgments, awards, obligations to defend or indemnify
> others, and other costs of every kind and character
> (including, without limitation, court costs, attorneys'
> fees, debts and interest), known or unknown, whether the
> underlying claim, demand, or suit is groundless, false or
> fraudulent.[157]

In Corbitt Shell's liability was not based on personal injury,

which was the type of injury for which the indemnification

provision expressly provided. But in this case, for the reasons

stated in § IV.A.1(b), above, the court has already concluded that

the injuries underlying Hess's breach of contract claims — the non-

conformities for which Hess revoked the SSVs — constitute breaches

of warranty. The Indemnity Provision expressly references breach

of warranty by stating that

> all release . . . and indemnity obligations . . . assumed
> by [Hess] and [Schlumberger] respectively under sections
> 13(c) and (d) shall be without regard to the . . .
> **breach of warranty** . . . defective condition (whether
> pre-existing or otherwise) of any . . . equipment . . .
> or other item whatsoever, . . . or any other fault of the
> indemnified parties or any other party excepting only the
> gross negligence, recklessness or willful misconduct of
> [Hess] or [Schlumberger],[158]

---

[157]MSC, § 13(a)(3), Docket Entry No. 25-3, p. 7.

[158]Id. at § 13(b), Docket Entry No. 25-3, p. 7 (emphasis
added).

-74-

and expressly states that it applies to "all claims brought by
. . . any party or person, for any and all . . . damage to or loss
of property of [Hess] . . . whether real or personal . . . whenever
and wherever occurring, arising directly or indirectly out of or in
any way involving [Schlumberger's] work."[159]  Because the Indemnity
Provision broadly defines "claims" to include "all . . . causes of
action," because Hess's breach of contract claims are based on
allegations that Schlumberger breached express warranties, and
because Hess's breach of contract claims arise from work performed
by Schlumberger, the court concludes that the language in the
Indemnity Provision is broad enough to clearly express the purpose
of including such claims within the indemnity coverage.  See
Corbitt, 654 F.2d at 334.

Finally, Hess argues that interpreting the Indemnity Provision
to encompass Hess's breach of contract claims would lead to an
absurd result whereby Schlumberger could materially breach the
parties' contract with impunity, but still be entitled to indemnity
or release from Hess.[160]  A basic principle of contract
interpretation is to interpret, to the extent possible, all the
terms in a contract without rendering any of them meaningless or
superfluous.  Chembulk Trading LLC v. Chemex Ltd., 393 F.3d 550,
555 (5th Cir. 2004).  Interpreting the contract to require

---

[159]Id. at § 13(c), Docket Entry No. 25-3, p. 7.

[160]Hess's MPSJ, p. 18, Docket Entry No. 118, p. 25.

indemnity for breach of contract in this case would therefore be contrary to the rules of contract interpretation if doing so rendered meaningless the requirements that Schlumberger furnish items that are "free from defects in design, materials, fabrication and other workmanship," and "conform to AHC's specifications, drawings or other descriptions contained in the applicable service agreement, purchase order, work order or other project document."[161]

Although Schlumberger argues that the injuries associated with Hess's alleged breaches of contract are property damages, Hess argues that they are not property damages but, instead, economic damages. Thus, even according to Hess there are scenarios in which Schlumberger could breach the parties' contract that do not fall under the indemnity provision. See Energy XXI, 787 F. Supp. 2d at 608 (recognizing that a similarly worded indemnity clause did not render a good and workmanlike manner clause meaningless in all cases). The court's conclusion that the Indemnity Provision is broad enough to encompass Hess's claims for breach of contract does not necessarily render meaningless the requirements that Schlumberger furnish items that are "free from defects in design, materials, fabrication and other workmanship," and "conform to AHC's specifications, drawings or other descriptions contained in the applicable service agreement, purchase order, work order or

---

[161]MSC, § 2(a), Docket Entry No. 25-3, p. 3.

other project document."[162] Accordingly, the court concludes that Hess is not entitled to summary judgment that the MSC's indemnity-and-release provisions do not apply to breach-of-contract claims.[163]

**B.   Hess Is Entitled to Partial Summary Judgment on Schlumberger's Affirmative Defense of Release and Counterclaim for Indemnity**

Hess argues that it is entitled to summary judgment on Schlumberger's affirmative defense of release and counterclaim for indemnity because the claims that it has asserted in this action do not seek recovery for "damage to or loss of" Hess's property.[164] For the reasons stated in § V.A.2, above, the court has already concluded that Hess's claims for costs to purchase replacements for the failed valves, costs to retrieve and replace the failed valves, and lost profits from the Gulfstar One facility are not claims for damage to or loss of Hess's property, but that Hess's claims for methanol contamination are claims for damage to or loss of Hess's property. Accordingly, the court concludes that Hess is entitled to summary judgment that its claims for costs to purchase replacements for the failed SSVs, for costs to retrieve and replace the failed SSVs, and for lost profits from Gulfstar One are not claims for "damage to or loss of" Hess's property, but that its claim for costs due to methanol contamination is a claim for damage to Hess's property that Hess has released.

---

[162]MSC, § 2(a), Docket Entry No. 25-3, p. 3.

[163]Id.

[164]Hess's MPSJ, Docket Entry No. 118, p. 15.

## VII. <u>Conclusions and Order</u>

For the reasons stated in § V, above, the court concludes that Schlumberger is entitled to summary judgment on Hess's claim for methanol contamination because that is a claim for damage to or loss of Hess's property that Hess released pursuant to § 13(c) of the MSC — but that Schlumberger is not otherwise entitled to summary judgment. Accordingly, Defendant Schlumberger Technology Corporation's Motion for Summary Judgment (Docket Entry No. 116) is **GRANTED IN PART** and **DENIED IN PART**.

For the reasons stated in § VI, above, the court concludes that Hess is entitled to summary judgment on Schlumberger's affirmative defense of release and counterclaim for indemnity with respect to Hess's claims for costs to purchase replacements for the failed valves, costs to retrieve and replace the failed valves, and lost profits from Gulfstar One because those are not claims for damage to or loss of Hess's property — but that Hess is not otherwise entitled to summary judgment. Accordingly, Hess Corporation's Motion for Partial Summary Judgment on Schlumberger's Affirmative Defense of Release and Counterclaim for Indemnity (Docket Entry Nos. 117 (redacted) and 118 (unredacted)) is **GRANTED IN PART** and **DENIED IN PART**.[165]

---

[165]The court has allowed the parties extraordinary leeway in submitting lengthy briefs and other written materials in connection with the pending motions. As the length of this Memorandum Opinion and Order indicates, the court has expended considerable time

(continued...)

For the reasons stated at the beginning of this Memorandum Opinion and Order, Hess Corporation's Motion to Exclude Expert Report of Lawyer Cary A. Moomjian (Docket Entry Nos. 119 and 120) is **GRANTED**; Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Dennis Read (Docket Entry No. 121) is **DENIED WITHOUT PREJUDICE**; Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of David Hirth (Docket Entry No. 122) is **DENIED WITHOUT PREJUDICE**; Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Peter Koopmans (Docket Entry No. 123) is **DENIED WITHOUT PREJUDICE**; Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Barry Pulliam (Docket Entry No. 124) is **DENIED WITHOUT PREJUDICE**; and Schlumberger Technology Corporation's Motion to Exclude the Expert Testimony of Rolle Hogan (Docket Entry No. 125) is **DENIED AS MOOT**.

Docket Call will be held on December 11, 2019, at 11:30 a.m., in Courtroom 9-B, 9th Floor, United States Courthouse, 515 Rusk Street, Houston, Texas 77002.

---

[165] (...continued)
reading these papers and performing a significant amount of independent research to be as fully informed as possible when addressing the parties' arguments. While, because of the sheer volume of information presented, it is not impossible that some arguments were overlooked, the parties should assume that failure to expressly address a particular argument in this Memorandum Opinion and Order reflects the court's judgment that the argument lacked sufficient merit to warrant discussion. Accordingly, the court strongly discourages the parties from seeking reconsideration based on arguments they have previously raised or that they could have raised.

Hess and Schlumberger have each submitted lengthy proposed findings of fact and conclusions of law.[166] Many of the proposed findings of fact could be agreed to or may not be necessary. Moreover, the proposed findings of fact and conclusions of law do not follow the same format. The parties are **ORDERED** to submit a Revised Joint Pretrial Order by December 4, 2019, that includes a **joint** submission of agreed and disputed facts presented in chart form. The chart should be arranged in some logical order, either by date, by subject matter, or following some other organizational format that will assist the court to follow and consider the evidence at trial. The chart should include a column for the court to make notes during trial, and the text should be color-coded to show findings of fact to which the parties agree in one color, i.e., black, and proposed findings of fact for which no agreement can be reached in different colors, with one color for Hess's proposed findings of fact, and another color for Schlumberger's proposed findings of fact. An example of such a chart follows:

|   | | Proposed Findings of Fact | Comments |
|---|---|---|---|
| 1 | ☐ | Agreed findings of fact in black. | |
| 2 | ☐ | Disputed findings of fact proposed by Hess in a color other than black. | |
| 3 | ☐ | Disputed findings of fact proposed by Schlumberger in a different color other than black. | |

---

[166]Exhibits M and N to Joint Pretrial Order, Docket Entry Nos. 151-13 and 151-14.

The parties shall deliver two hard-copies of the chart to chambers printed on large format (11"x17") paper with the Revised Joint Pretrial Order.

**SIGNED** at Houston, Texas, on this 7th day of November, 2019.

_____
SIM LAKE
SENIOR UNITED STATES DISTRICT JUDGE